# STATE EX REL. VOILES v. JOHNSON COUNTY HIGH SCHOOL, ET AL.

(No. 1728; Nov. 24, 1931; 5 Pac. (2d) 255)

For defendants there was a brief and oral argument by *Robert B. Rose,* of Buffalo, Wyoming.

For the plaintiff there was a brief and oral arguments by *Burton S. Hill* and *Burt Griggs,* both of Buffalo, Wyoming.

498

RINER, Justice.

This case is here upon constitutional questions reserved and certified to this court by the District Court of Johnson County as important and difficult, and as arising in the action pursuant to the provisions of Sections 6398-6400, W. C. S. 1920. An order has heretofore been entered herein indicating the answers deemed by us proper to be made in response to these questions, and also that the opinion concerning them would be subsequently filed.

The action in the course of which the proceedings at bar were instituted is an application by the plaintiff for a writ of mandamus to be directed to the defendants requiring them to issue certain negotiable coupon bonds of Johnson County High School, State of Wyoming. To plaintiff's petition the defendants interposed a general demurrer and the facts thus presented and necessary to be considered in connection with the law (c. 52, Laws of Wyoming 1931), whose constitutional validity is directly attacked, are these:

The plaintiff is a duly qualified elector of Johnson County High School, State of Wyoming, and the owner of real and personal property assessed upon the assessment roll of one of the school districts embraced in the High School District aforesaid. The defendant Johnson County High School, State of Wyoming, herein generally referred to as the "District", or the "High School District", is a corporation organized under the provisions of Chapter 155, W. C. S. 1920, relating to the establishment and management of high school districts, and includes some eleven school districts within its boundaries. The remaining defendants are respectively the seven trustees of said High School District and the County Treasurer of Johnson County, who is ex-officio the High School District Treasurer and is by law required to countersign and register any bonds issued by that District.

On March 14, 1931, the trustees aforesaid regularly called a special election to authorize the issuance by the District of its coupon bonds in the sum of $175,000, for the

erection of a high school building therein. Due and proper notice of this election to be held on April 28, 1931, was given, the notice, in addition to other necessary information therein contained, stating that:

"All qualified electors shall be entitled to vote on the question submitted and ballots will be furnished to all qualified electors in the following manner: Two ballot boxes designated "Ballot Box A" and "Ballot Box B" shall be provided by the officers, conducting the election at each polling place. Electors, and the spouses of electors, owning real or personal property assessed on the assessment roll of Johnson County located within said High School District, shall be given two ballots—one white and one yellow—and they shall have the privilege of voting on the question submitted by placing the white ballot in Ballot Box A and the yellow ballot in Ballot Box B. All qualified electors who are not the owners of, or the spouses of the owners of, real or personal property assessed on the assessment roll of Johnson County located within said High School District, shall be given one white ballot which shall be placed in Ballot Box A.

"Before any person shall be permitted to vote a ballot printed on yellow paper, he shall be required to make before the Judges of election, who are hereby authorized to take the same, an affidavit showing that he is the owner of, or the spouse of the owner of, real or personal property assessed on the assessment rolls of Johnson County within the High School District."

When the election was held, the above quoted directions contained in the notice were specifically followed by the officers in charge, and in consequence two ballot boxes were used, in one of which—Ballot Box A—were deposited the ballots of all qualified electors of the High School District, while in the other—Ballot Box B—the ballots of electors and the spouses of electors owning real or personal property assessed on the assessment roll of Johnson County within said District were received.

The result of the election was duly canvassed on May 6, 1931, by the Board of Trustees of the District, whereby it

was determined that of those voting in Ballot Box A, 492 had voted against the issuance of said bonds and 527 had voted in favor of such issuance, and that of those voting in Ballot Box B, 463 voted for and 475 against such issuance. It is interesting to note, although perhaps not material here, that the Board also found in ten of the eleven school districts embraced within the High School District, in both Ballot Boxes A and B, the total votes stood more than four to one against the issuance of said bonds; in the remaining district and apparently the largest in population, the vote was somewhat less than two to one in both ballot boxes in favor of creating the indebtedness. After canvassing the vote, as aforesaid, and ascertaining that the bonds had carried by a majority of 35 in Ballot Box A, and had lost by a majority of 12 in Ballot Box B, the Board of Trustees adopted a resolution declaring the election lost, and that the Board should "proceed no further in the matter of the issuance of the above described bonds."

The law which controlled the Board in its refusal to issue the bonds, and which, as previously stated, is claimed by plaintiff to be in violation of several sections of the Constitution of this state, is Chapter 52 of the Laws passed by the 20th State Legislature, the enactment becoming operative February 17, 1931. Its provisions here pertinent are as follows: Section 1 defines the word "municipality" or "municipal" when used in the law, as including, among other public subdivisions and corporations of the state, a high school district. Section 2 directs that when the state or any municipality therein proposes to issue its bonds within constitutional debt limitations (other than refunding bonds), the proposal shall be submitted at a general or special election called for that purpose, "to the general electors of the State or said municipality who are not property owners or the spouses of property owners and also to the electors thereof who are the owners of real or personal property therein, in the manner hereinafter set forth."

Section 3 requires the officials conducting any such election to—

"provide two Ballot Boxes for the purpose of such election at each polling place. One of said Ballot Boxes shall be designated as Ballot Box "A" and the other shall be designated at Ballot Box "B". Said officers shall also provide for the use of the voters entitled to vote at said election in the manner hereinafter set forth, two sets of Ballots, one of which shall be printed on white paper and the other on colored paper, and both of which shall contain the same statement of the proposal to be voted upon and the same instructions respecting the manner of marking the ballot."

Section 4 of the act is, verbatim:

"Every citizen of the United States of the age of 21 years and upwards who has resided in the State one year and in the municipality 60 days next preceding such election and who has complied with the registration laws in the event that prior registration is required at such election, shall be entitled to vote thereat. If such elector is not the owner of or the spouse of the owner of real or personal property assessed on the assessment roll of any County of the State, in the case of a State Bond Election, or on the assessment roll of the municipality in the case of a Municipal Bond Election, he shall be furnished by the officers conducting such election a ballot printed on white paper, and the ballots of all such persons shall be deposited in Ballot Box A. If such elector is the owner of or the spouse of the owner of real or personal property assessed on the assessment roll of one or more of the Counties of the State, in the case of a State Bond Election, or on the assessment roll of the municipality in the case of a Municipal Bond Election, he shall be furnished by such officers a ballot printed on colored paper and the ballots of all such persons shall be deposited in Ballot Box B. Before any person shall be permitted to vote a Ballot printed on colored paper he shall be required to make before the officers of election, who are hereby authorized to take the same, an Affidavit showing that he is the owner of real or personal property assessed on the assessment rolls in the State or Municipality as the case may be."

Section 5 directs the election officers to canvass the votes immediately after the closing of the polls, to keep separate and distinct records of the canvass of the ballots in Ballot Box A, and the results of such canvass are required to be certified by these officials to the authorities submitting the proposal to issue the bonds. The section then concludes:

"If the majority of the ballots in each box is in favor of the issuance of the bonds, the proposal to issue said bonds shall have carried, and the proper officers of the State or Municipality shall in the manner now provided by law proceed to complete the printing, execution, advertising and sale of said bonds. If the majority of the ballots in either of said boxes is against the issuance of said bonds the proposal to issue said bonds shall have failed, and said proper officers shall proceed no further with the printing, execution, advertisement or sale of said bonds."

It will be observed that the election, as held, varied somewhat in its conduct from that prescribed by the exact terms of the statute set out above, in that all the qualified electors of the district voted in Ballot Box A throughout the District, instead of—as the law directs—simply the electors who were not the owners of, or the spouses of the owners of, real or personal property assessed on the proper assessment roll. However, so far as the questions before us are concerned, this variance makes no difference.

The first two questions submitted upon the record may be considered together. They inquire whether Chapter 52, Laws of Wyoming 1931, supra, violates the provisions of either Section 27, Article I of the State Constitution, which reads: "Elections shall be open, free and equal, and no power, civil or military, shall at any time interfere to prevent an untrammeled exercise of the right of suffrage," or Section I of Article VI of that instrument, whose language is:

"The rights of citizens of the State of Wyoming to vote and hold office shall not be denied or abridged on account

of sex. Both male and female citizens of this state shall equally enjoy all civil, political and religious rights and privileges.''

Plaintiff insists that the law fails to meet the demands of these sections, particularly in that it disregards their provisions for equality in elections. No authorities are cited in support of these contentions.

In approaching the problems presented by each of the submitted questions, it must be constantly borne in mind that all laws resulting from the operation of the constitutionally established lawmaking machinery of a state are presumed to be constitutional, and the courts will not conjure up theories to overturn and overthrow the solemn declarations of the legislative body. There must be a plain violation of some provision of the fundamental law. State v. Snyder, 29 Wyo. 163-179, 212 Pac. 758; State v. W. S Buck Mercantile Co., 38 Wyo. 47, 264 Pac. 1023, 57 A. L. R. 675, 6 R. C. L. 97.

Passing to a consideration of the contentions of the plaintiff touching the two questions stated above, in 20 C. J. 170 we find it said that:

''A constitutional provision that all elections shall be free and equal means that they shall be free in that every one entitled to vote shall have a reasonable opportunity of doing so and equal in that every vote cast shall have its decisive effect in the selection or choice to be made at the election.''

Concerning the same subject, 9 R. C. L. 984, § 8, also says:

''Legislative regulations as to the manner of voting and the restrictions placed thereon must be tested frequently by the broad rule laid down in many constitutions to the effect that elections must be 'free and equal.' Under such a guaranty the right to vote, as the words expressly state, must be maintained absolutely free, and the vote of every elector must be granted equal influence with that of every other elector.''

Speaking of the effect of such language in the Constitution of Illinois, the Supreme Court of that state remarked in People ex rel. Lindstrand v. Emmerson, 333 Ill. 606, 165 N. E. 217, 220, 62 A. L. R. 912:

"Section 18 of Article 2 of the constitution requires that all elections be free and equal. This has been held by this court to mean that every qualified voter may freely exercise the right to cast his vote without restraint or coercion of any kind, and that his vote, when cast, shall have the same influence as that of any other voter. (McAlpine v. Dimick, 326 Ill. 240, 157 N. E. 235; People v. Fox, 294 id. 263, 128 N. E. 505; Rouse v. Thompson, 228 Ill. 522, 81 N. E. 1109, supra; People v. Election Comrs., 221 Ill. 9, 77 N. E. 321, 5 Ann. Cas. 562.)"

Did the cast vote of each elector in the election we are now considering have the same influence as that of any other voter, and did it have its decisive effect in the disposition of the question before the electorate? We are unable to see why it did not. The vote deposited by the elector qualified to vote in Ballot Box A was, under the law in question, given exactly the same effect in determining the result of the election as that of the voter required to place his vote in Ballot Box B. A majority in each of Ballot Boxes A and B for the issuance of the bonds carried the proposition; a majority in each of Ballot Boxes A and B against their issuance rejected it; and a majority in either box against such proposition also rejected it. The exact effect of the plan of voting required by the law was not to interfere with that equality in the election, as prescribed in the sections of the Constitution which are relied on by plaintiff, but simply to place additional restrictions on the right of the municipality to borrow money on its written promissory obligations. Whether the Legislature was vested with power to do this will hereinafter be discussed.

To the argument that the election was not open, free and equal, and thus in violation of Section 27 of Article I aforesaid, because, as it is claimed in the petition and argument

submitted, all taxpayers in the District are not allowed by the law to vote in Ballot Box B, but only those taxpayers or their spouses who are assessed upon the assessment roll of the county, reference being had particularly to the owners of automobiles who, under the provisions of Chapter 122, Laws of Wyoming 1929, pay only a fixed county fee in lieu of all other taxes except such fees as may be imposed by municipalities under regulatory ordinances, it is sufficient, we think, to refer to the statement by Judge Cooley in I Constitutional Limitations (8th ed.) 339, where it is said: "Nor will a court listen to an objection made to the constitutionality of an act by a party whose rights it does not affect, and who has therefore no interest in defeating it." This legal principle was definitely announced and applied by this court in Salt Creek Transportation Co. v. Public Service Commission, 37 Wyo. 488, 263 Pac. 621.

Under the peculiar provisions of Chapter 122 aforesaid, the owner of an automobile will not be affected by the creation of the indebtedness resulting from a bond issue. He pays only a fixed fee as determined by that law, and no other taxes on the vehicle. The theory of the Legislature, in requiring the owners of, or the spouses of the owners of, property assessed on the assessment roll of the proper county, to vote in Ballot Box B, undoubtedly was that the will of those whose property interests as regards taxes would be particularly affected, should be therein manifested. Clearly then, the owner of an automobile should vote at the election as all others do who will not bear any of the burden of the additional taxation resulting from the issuance of the bonds. See Hartman v. Meier, 39 Idaho 261, 227 Pac. 25.

The third and fourth questions, which also may be considered together, are, respectively, whether Chapters 52 aforesaid is inimical to the provisions of Section 2 of Article VI of the State Constitution, and whether it contravenes the requirements of Section 4 of Article XVI. Section 2 of Article VI is couched in this language:

"Every citizen of the United States of the age of twenty-one years and upwards, who has resided in the state or territory one year and in the county wherein such residence is located sixty days next preceding any election, shall be entitled to vote at such election, except as herein otherwise provided."

Section 4 of Article XVI directs that:

"No debt in excess of the taxes for the current year shall, in any manner, be created by any county or sub-division thereof, or any city, town or village, or any sub-division thereof in the state of Wyoming, unless the proposition to create such debt shall have been submitted to a vote of the people thereof and by them approved."

Plaintiff insists that two cases previously decided by this court rule, in effect, that Chapter 52 aforesaid is in violation of the two sections of the Constitution last above quoted, and that they are to be interpreted as declaring that the Legislature may only constitutionally pass an act requiring that before the election contemplated in Section 4 of Article XVI of the Constitution can be held, there may be a petition, referendum or primary of some kind to be participated in by the property owners alone, to determine whether the election itself shall be held.

The cases thus relied on and wherein the effect of the two sections of the fundamental law of this state now under consideration was quite fully considered, are Simpkin v. City of Rock Springs, 33 Wyo. 166, 237 Pac. 245, 252, and West, et al. v. School District No. 9, 37 Wyo. 36, 258 Pac. 583, 586.

In the Simpkin case it was held that a law (c. 36, Laws of Wyoming 1925) which provided in substance that only taxpayers or the wives or husbands of owners of real property could vote in bond elections, was invalid, so far as it concerned elections or propositions to create public debt required to be submitted to a vote of the people by said Section 4 of Article XVI, or any other section of that article

when construed with said Section 2 of Article VI, the word "people" as used therein meaning the electors, as defined by Section 2 last mentioned. In the course of the opinion disposing of the case, the following language was used:

"Assuming that the legislature might *add* to the restrictions contained in the constitution upon the question of municipal debt, by, for example, requiring also the consent of a majority of real estate owners or taxpayers, to be expressed either by petition or referendum vote, or in some other manner, as a condition to authority for the issuance of the bonds as proposed, as we may suppose they might do, that is not the purport nor the effect of the statute in question."

A little more than two years later, this court again had the same sections of the Constitution before it in the case of West, et al. v. School District No. 9, supra, where, following the Simpkin case, it was determined that Chapter 35, Laws of Wyoming 1925, which required that electors voting on special school district appropriations of money and bonding of school districts, should be taxpayers on real property in such districts, or the owners or the husbands or wives of owners of real property therein, was likewise unconstitutional as being in contravention of those sections. In that case, also, it was further said in similar vein with the excerpt above given from the Simpkin case:

"As we have heretofore said, Section 4 above mentioned was intended as a restriction upon the power to vote indebtedness, and the framers of the Constitution deemed the method pointed out as an appropriate method, or at least as one of the appropriate methods to make the intended restriction effective. It is not for us to say that the requirement that all the qualified voters, whether taxpayers or not, should participate in the creation of such indebtedness, is not the best means to the intended end. It is one of the means to that end, and a means which cannot be ignored. We may assume, as was said in the Simpkin case, that the legislature may add to the restriction contained in the Constitution, but it cannot nullify those contained

therein. Without now determining the point, we may assume that as an additional restriction, the legislature might, as a prerequisite to a bond issue, also require the consent of the majority or other proportion of the property owners or taxpayers, such consent to be expressed in a manner deemed proper by the legislature, as, for instance, by an election or meeting to be participated in only by such per-. sons.''

It is difficult to read the quoted language from the two cases last cited and then the provisions of Chapter 52, supra, subsequently enacted, and not reach the conclusion that the Legislature must have had it in mind when the law in question was framed. While not necessary to a decision of those cases, the views thus repeatedly expressed were not inadvisedly uttered. They invoke a familiar and fundamental principle of constitutional law which, perhaps, has by no one been more forcefully delineated than by Judge Cooley. In his Constitutional Limitations (8th ed.) Vol. I, pages 345-6, he says:

"Except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the law-making power.''

In the case of State v. Snyder, Treasurer, 29 Wyo. 199, 212 Pac. 771, 779, this court declared that:

"The legislature of this state possesses all legislative authority except as restricted by the state or Federal Constitution, either expressly or by clear implication."

See also 12 C. J. 748-749, § 168 and cases cited; State ex rel. Agricultural College v. Irvine, 14 Wyo. 318, at 389, 84 Pac. 90, 106.

By way of illustration of the judicial application of this axiom of constitutional law to concrete facts, reference to a few cases will suffice. In Budge v. Board of Commissioners of Lincoln County, 29 Wyo. 35, 208 Pac. 874, it appeared, on reserved constitutional questions, that by Chapter 53, Laws of Wyoming 1921, Teton county was formed from a part of the territory included in Lincoln county. The proposed county contained a population of only 1600 bona fide residents and property valued by the last preceding assessment for taxation at only $2,335,000. The organization of Teton county was undertaken, nevertheless, and was challenged because of the provisions of Section 1281, W. C. S. 1920, which forbade the organization of a new county unless it possessed property of the value of $5,000,000, as shown by the last preceding assessment for taxation, and possessed, also, a population of 3,000 bona fide residents. In excuse of this attempted organization it was urged that said Section 1281 was unconstitutional, in that thereby the Legislature had added to the property valuation necessary for the formation of a county and the inhabitants for its organization fixed by Section 2 of Article XII of the State Constitution, which reads in part:

"But no new county shall be formed unless it shall contain within the limits thereof property of the valuation of two million dollars, as shown by the last preceding tax returns, and not then unless the remaining portion of the old county or counties shall each contain property of at least three million of dollars of assessable valuation; and no new county shall be organized nor shall any organized county be so reduced as to contain a population of less than one thousand five hundred bona fide inhabitants."

But it was held that the Legislature had power to place these added restrictions upon the organization and formation of a county, over and above the requirements of the Constitution.

In Morrison v. Springer, 15 Iowa 304, the constitutionality of an act of the Iowa legislature was involved, which undertook to enable the qualified electors of the state in military service to vote in certain elections and to cast their votes in polls opened and conducted beyond the limits of the county and the state of which they claimed to be residents. It was insisted that the act conflicted with the clause of the State Constitution providing:

"Every white male citizen of the United States, of the age of twenty one years, who shall have been a resident of this State six months next preceding the election, *and of the county in which he claims his vote* sixty days, shall be entitled to vote at all elections which are now or may be authorized by law."

The conclusion was, however, reached, that the law was within the due exercise of legislative power, and concerning the subject in which we are here interested, the court said:

"We suppose it to be a proposition which will not be denied, that where the time, place and manner of holding elections are not prescribed by the Constitution, but committed to the Legislature, the reception of votes out of the precinct or county of the elector's residence may be constitutionally authorized. It is expressly so held in the case above cited from Connecticut, and this ruling certainly accords with the object and purpose of a State Constitution, and the powers well understood to be possessed by the Legislature; for the Constitution, as applied to the legislative department, is a limitation and not a grant of power. Or, in other words, if the Legislature is not restricted, it has full power to provide who shall have the right of suffrage, and prescribe the time, place and manner of its exercise; for the Legislature clearly has the power to legislate on all rightful subjects of legislation, unless expressly prohibited from so doing, or where the prohibition is implied from

some express provision. This theory must never be lost sight of by courts in examining the powers of the Legislature. It is elementary, cardinal, and possesses frequently controlling weight in determining the constitutional validity of their enactments. Where the prohibition is express, of course, there can be no exercise of power. So where it is necessarily implied from some express provision, the law-making power cannot interfere.''

This principle of constitutional law we are now considering was also applied in Prairie Oil and Gas Co. v. District Court, 71 Okla. 32, 174 Pac. 1056, where it was held that an act of the legislature authorizing suit to be filed against any foreign corporation doing business in the state, in any county thereof where such corporation had property, was not repugnant to a clause of the Oklahoma Constitution which authorized suit to be maintained against a foreign corporation "in the county where an agent of such corporation may be found, or in the county of the residence of the plaintiff, or in the county where the cause of action may arise.'' The tenor of the decision is briefly shown by the following language taken from the opinion in the case:

"A legislative act cannot, therefore, be declared void, unless its conflict with one of these two instruments (the Constitution of the United States and State Constitution) can be pointed out. The Constitution merely provides that a foreign corporation may be sued in certain designated counties. It contains no inhibition against the Legislature authorizing suits to be brought in other counties, and does not, therefore, unless impliedly, exclude the Legislature from enacting a statute providing additional places where suits may be brought, conditioned that such legislation be not in conflict with the Constitution.''

Again, in Bethune v. Salt River Valley Water Users' Association, 26 Ariz. 525, 227 Pac. 989, 992, where the validity of the law fixing one of the qualifications for voting in the government of the Water Users' Association to be the ownership of real estate, was attacked as in violation

of a constitutional clause dealing with the same subject, the court said:

"Still another reason for the unconstitutionality of this act is said to be found in a provision which it contains, making one of the qualifications for voting in the government of the association the ownership of real estate. It is said that the Legislature, by this provision of the statute, violated Section 13, Art. 7, of the state Constitution, which is as follows:

" 'Questions upon bond issues or special assessments shall be submitted to the vote of the property taxpayers, who shall also in all respects be qualified electors of the state and of the political subdivision thereof affected by such question.'

"Appellee seems to consider the effect of this section of the Constitution to be a grant of authority to every elector, otherwise qualified, who possesses any property whatsoever, to vote at all such elections. That is not its effect or import. Constitutions measure the power of the rulers; they do not measure the rights of the government. They withdraw from the Legislature, which otherwise possesses plenary powers of legislation, the authority to do certain things, and to enact laws of a certain effect.

" 'When a state law is attacked upon the ground that it is in violation of the Constitution, it is presumably valid, and this presumption is a conclusive one, unless in the Constitution of the United States, or of the state, we are able to discover that it is prohibited. * * * The lawmaking power of the state, it is said in one case, recognizes no restraints and is bound by none, except such as is imposed by the Constitution.' Cooley's Constitutional Limitations, 241.

"This constitutional provision in effect forbids the Legislature to pass any law which shall give the franchise, for the purposes mentioned in it, to any who are not holders of property. The Legislature is left unrestricted in any regulation which it may think wise to make so long as it does not violate that prohibition. It is at liberty to determine the kind and character of property which the elector shall possess as a condition of his exercising the franchise in any given instance.

"The law under consideration provides for the organization of districts which shall be authorized to provide means

of irrigation of the lands within such district. It deals primarily with real estate and fittingly delegates the authority to determine the questions arising in the government of such districts to the holders of such lands.''

In the light of the authorities hereinabove cited, we see no limitation either express or implied placed upon the power of the Legislature of this state by the provisions of either Section 2 of Article VI, or Section 4 of Article XVI of our Constitution, to enact such a law as we have seen Chapter 52, Laws of Wyoming 1931, to be. The Simpkin and West cases, supra, make it plain that these sections of our fundamental law merely impose one restriction upon the power to vote indebtedness in a case such as is now at bar, viz., the requirement that all the qualified voters, whether they are property owners or not, should have the opportunity of expressing their will concerning the creation of such indebtedness. This requirement the law in question seems to us to fully meet. That it places additional restrictions such as requiring two ballot boxes to be used in ascertaining the views of the electorate—one for the votes of non-property owners and the other for the votes of owners or spouses of owners of property assessed on the assessment roll of the territory concerned in the matter—and as directing that a majority in favor of the creation of the indebtedness must exist in both boxes as a result of the election before bonds may be issued, is, it also seems to us, quite within the broad powers entrusted by the people to the legislative department of this state.

That in the case at bar all property owners and all non-property owners were required to vote in Ballot Box A, while those voting in Ballot Box B were confined solely to the owners or the spouses of owners of assessed property, would not appear to make any practical difference. The votes of the property owners in Box A were merely surplusage and in no way influenced the result.

A subdivision of the county, such as is concerned in the case now before us, created solely by the fiat of the Legisla-

ture and not even mentioned in the Constitution of the state, has no inherent right to vote bonds. Neither has any other public corporation of the state such right. That right, therefore, must be derived entirely from the statute, the terms of which are to be substantially complied with. The effect of voting and issuing bonds by such a district is, of course, to increase the taxes upon all the assessable property of the district for the payment of such bonds and interest. The Legislature has deemed it proper to direct that before such added burden shall be assumed, a majority of those who must bear it shall also express their approval thereof, as well as a majority of those who do not. Were we concerned with the wisdom of the legislation, we can see nothing unreasonable or unjust in such additional restriction.

It was conceded on the argument by counsel for plaintiff, as understood by us, that the Legislature would have the power, if the proposition to issue the bonds of the district were directed by law to be determined by the votes of all the electors in the district, without the added restrictions the law attacked contains, to provide that a majority of two-thirds or three-fourths of the votes cast should be necessary to carry it. Indeed, restrictions of this sort have frequently been deemed so vital and necessary by the people that they have been inserted in a number of state constitutions. If the Legislature may do this, it may logically require the unanimous consent of all the electors of the district before bonds can be issued, or it might prohibit their issuance entirely.

It will be recalled that the High School District here affected is composed of eleven school districts. It would appear from the record in the instant case that some of these districts had very few electors, and at least one of them had, as electors, only those who owned assessed property. It is difficult to perceive why the Legislature, under its plenary power, might not have legally required a majority vote in each school district as necessary to authorize the issuance

of the bonds. In Vandusen v. Fridley, 6 Dak. 322, it was held that where a question in which two districts were equally concerned was submitted to the voters under a statute disclosing a legislative intention that a majority vote in each district should be required to carry the measure, it was lost if the majority in one district voted against it, although the majority of the whole number of votes was cast in its favor. Had the Legislature pursued any of the courses thus suggested in framing the law governing the conduct of the election, in that event the controlling power of only a few votes would be quite as efficacious as in the extreme instance suggested and argued by plaintiff relative to the act now under review. Such arguments, however, deal with the propriety of the legislation and should be addressed to the lawmaking body.

Plaintiff concedes, also, that the Legislature may constitutionally enact a law requiring that before the election contemplated in Section 4 of Article XVI, supra, can be held, there must be a primary or referendum of some kind, to be participated in only by the property owners of the district, to determine whether the election itself shall take place, and this it is insisted is the effect of the language quoted above from the Simpkin and West cases. We do not so interpret that language. In each of those cases the suggested propriety of added restrictions dealt not with whether an election should be held or not, but with conditions ''to authority for the issuance of the bonds as proposed''— the submission to the electorate, generally, being one of those conditions. Whether the will of the property owners concerning the advisibility of creating the indebtedness is taken before, at the time of or after the election at which the proposition is submitted, makes no difference that we can see.

Concerning the fifth reserved question, it is only necessary to say that this court is not required to answer it, inasmuch as it fails to designate any specific constitutional provision claimed to be violated. Salt Creek Transportation

Co. v. Public Service Commission, 37 Wyo. 488, 263 Pac. 621.

From what has been said, it is apparent that our conclusions, as embodied in the order heretofore entered, are, that each of the reserved questions, except the last, should be answered in the negative, the last question remaining unanswered for the reason hereinabove given.

KIMBALL, C. J., and BLUME, J., concur.