[OCTOBER TERM, 1932]

## SPRIGGS v. CLARK, SECRETARY OF STATE
(No. 1798; Oct. 6, 1932; 14 Pac. (2d) 667)

The case was submitted for the appellant on the brief of *John J. Spriggs,* of Lander, Wyoming, *pro se.*

64

The cause was submitted for the respondent on the brief of *J. A. Greenwood*, Attorney General; *Richard J. Jackson*, Deputy Attorney General; *George W. Ferguson*, Assistant Attorney General, and *R. Dwight Wallace*, Assistant Attorney General, all of Cheyenne, Wyoming.

66

RINER, Justice.

The plaintiff and appellant brought an action in the District Court of Laramie County seeking to enjoin A. M. Clark as Secretary of State of the State of Wyoming, defendant and respondent, from certifying to the county clerks of the several counties of the state for submission to the electorate at the next general election occurring on November 8, 1932, the question stated in a certain resolution adopted by the State Legislature and approved March 6, 1931. This resolution, omitting formal parts, is as follows:

"That in the present state of public agitation respecting the prohibition of the manufacture and sale of intoxicating liquors for beverage purposes by the Federal Constitution it is expedient to obtain an expression of the opinion of the electors of the State of Wyoming respecting the desirability of the repeal of the Eighteenth Amendment to the Constitution of the United States;

"That to this end there shall be submitted to the electors of the State at the next general election the following question:

" 'Shall the Eighteenth Amendment to the Constitution of the United States prohibiting the manufacture and sale of intoxicating liquors for beverage purposes be repealed?'

"That it shall be the duty of the Secretary of State to certify the foregoing question to the county clerks of the several counties of the State of Wyoming not less than twenty-five (25) days prior to the next general election and it shall be the duty of the county clerks in the several counties to provide a place for the said question upon an official ballot in such manner that the electors shall have the opportunity of voting 'Yes' or 'No' to such question.

"That the Secretary of State be and he is hereby directed to transmit to the Congress of the United States a certificate of the results of the foregoing referendum."

Plaintiff's petition asserted the unconstitutionality of this resolution and the consequent illegal use and expenditure of public funds in election expense if the question embodied therein should be so certified; that the taxpayers

and citizens of the state would suffer irreparable damage if the defendant should be permitted to thus act and that there is no adequate remedy at law afforded plaintiff.

The defendant, after the court had sustained in part his motion to strike out sundry portions of the petition as irrelevant, answered admitting his intention to comply with the requirements of said resolution and denied that plaintiff or anyone would suffer any injury by reason of such action. The answer further alleged that the resolution "was and is a valid, legal, and constitutional measure within the authority of the Legislature of the State of Wyoming to enact." Plaintiff filed a motion to strike out most of the allegations of the answer as constituting no defense and for judgment on the pleadings.

The cause was heard by the court solely upon the pleadings filed, plaintiff's motions and a stipulation of the parties that plaintiff is a taxpayer and qualified elector of Fremont County in the State of Wyoming and that he "brings this action on behalf of himself and for the benefit of all taxpayers and electors in the State of Wyoming." The stipulation also stated that the copy of the resolution aforesaid attached to plaintiff's petition was a true copy thereof. Upon the conclusion of the hearing a decree was signed by the court overruling plaintiff's motion to strike, denying the injunction sought and dismissing his petition. To review that decree, he has instituted these proceedings by direct appeal.

On account of the proximity of the next general election, both parties to the cause, with the acquiescence of this court, agreed to shortened periods for the filing of briefs herein and the prompt submission of the cause thereafter.

For the defendant and respondent it is said that courts of equity have no authority or jurisdiction to interpose for the protection of rights which are merely political and involve no civil or property rights and that appellant

possesses no sufficient interest in the cause to warrant institution of this suit, his injury, if any, being trifling and no special or irreparable injury to his civil or property rights being shown. In elaboration of his contention defendant also points out that it is generally held that the jurisdiction of equity cannot be invoked for the purpose of enjoining elections since elections in themselves involve no property rights and pertain solely to the political administration of government. Pagosa Springs v. People, 23 Colo. App. 479, 130 Pac. 618; Tolbert v. Long, 134 Ga. 292, 67 S. E. 826, 137 Am. St. Rep. 222; Fletcher v. Tuttle, 151 Ill. 41, 37 N. E. 683, 42 Am. St. Rep. 220, 25 L. R. A. 143; Young v. Beckham, 115 Ky. 246, 72 S. W. 1092, 1094; Hood v. Sutton, 175 N. C. 98, 94 S. E. 686; McAlester v. Milwee, 31 Okla. 620, 122 Pac. 173, 40 L. R. A. (N. S.) 576; Copeland v. Olsmith, 33 Okla. 106, 124 Pac. 33; Chappel v. McCown, 103 S. C. 6, 87 S. E. 147; Roper v. Lumpkins, (Tex. Civ. App.) 163 S. W. 110; Scott v. James, 114 Va. 297, 76 S. E. 283; Mann v. Mercer County Ct., 58 W. Va. 651, 52 S. E. 776; Stephenson v. Cowan, 25 Manitoba 67, 20 Dominion L. Rep. 605, 30 West L. Rep. 297, 7 West. Wkly. Rep. 772; Little v. McCartney, 18 Manitoba 323; Gingras v. Longueuil, 17 Quebec Pr. Rep. 352.

However, there seem to be well considered cases which recognize an exception to the general rule just mentioned, where an election would be quite without authority of law and would be void, thereby causing unnecessary and improper expense. In such event it is declared that a taxpayer or other person who will be injured thereby is entitled to an injunction. 32 C. J. 256 and cases cited in note 75. Hawke v. Smith, 253 U. S. 221, 40 S. Ct. 495, 64 L. Ed. 871, 10 A. L. R. 1504.

We understand appellant's contention to be that the resolution of our State Legislature quoted above is invalid in its entirety because no warrant for it can be found in the Constitution of Wyoming and that it under-

takes to disregard the provision of Article 5 of the Federal Constitution which, it will be remembered, provides in part:

"The Congress, whenever two-thirds of both houses shall deem it necessary, shall propose amendments to this Constitution, or, on the application of the Legislatures of two-thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this Constitution, when ratified by the Legislatures of three-fourths of the several states, or by conventions in three-fourths thereof, as the one or the other mode of ratification may be proposed by the Congress:"

These contentions we prefer to consider on their merits in order to reach our disposition of the cause.

The authority relied on to establish appellant's claim under the clause of the National Constitution above recited is that of Hawke v. Smith, supra. That case, as we read it, is, however, not in point. There it appeared that the Ohio State Legislature had, pursuant to the terms of the joint resolution of Congress adopting the Eighteenth Amendment to the Constitution of the United States and submitting the same to the several state legislatures for action thereon, ratified by resolution the proposed Amendment and ordered due proof of such action to be certified to the Secretary of State at Washington, D. C. This resolution by the State Legislature was adopted January 7, 1919 (108 Ohio Laws p. 1334) and certification of the same was made some twenty days thereafter. January 29, 1919, ratification of the Amendment by the necessary number of states was proclaimed—Ohio being listed as one of the states so acting. A provision of the Ohio State Constitution adopted in 1918 (Art. 2 Sec. 1) read:

"The people also reserve to themselves the legislative power of the referendum on the action of the General Assembly ratifying any proposed amendment to the Constitution of the United States."

70

Hawke instituted suit to restrain the Secretary of State of Ohio from spending the public money in the preparation of ballots for submission, under the clause last above quoted, of a referendum to the electors of that state on the question of the ratification which the legislature had previously made of the proposed amendment. The courts of Ohio declined to give Hawke any relief. 100 Ohio St. 385, 126 N. E. 400. On writ of error to the Supreme Court of that state, the national court of last resort reversed the former's judgment, deciding that it was "not the function of courts or legislative bodies, national or state, to alter the method which the Constitution has fixed" governing the ratification of proposed amendments to the Federal Constitution and also that the Ohio court accordingly "erred in holding that the state had authority to require the submission of the ratification to a referendum under the state Constitution." 253 U. S. 221, 40 S. Ct. 495; 497, 64 L. Ed. 871, 10 A. L. R. 1504.

The Legislature of this state ratified the proposed Eighteenth Amendment to the Constitution of the United States, January 17, 1919. We have no provision in our State Constitution (Laws 1919 p. 269) or any statutory enactment of any kind even remotely resembling the clause of the Ohio Constitution attacked in the litigation above mentioned. The resolution involved in the case at bar does not in any way purport to deal with the question of ratification of the Eighteenth Amendment—an accomplished fact so far as this state is concerned—or attempt to engraft additional requirements upon the method provided by the Federal Constitution for the amendment of that document. It deals solely with the matter of securing in an orderly, easy and accurate way the views of the electors of this state concerning another subject entirely, viz., "the desirability of the repeal of the Eighteenth Amendment" aforesaid and the due certification of those views to the Congress of the United States. In other

words, it undertakes to supply the political body whose duty it is to initiate proceedings to change the National Charter with reliable information concerning the attitude of the people of this commonwealth on a question admittedly of serious interest and importance to them from both state and national standpoints. Such information is proposed to be furnished, too, at an opportune time for it is common knowledge that the two major political parties which control the Congress of the United States both advocate prompt legislative action on its part relative either to modifying or to repealing the Eighteenth Amendment. Is there any sound reason why this information should not be supplied? No case has been drawn to our attention which answers this question in the affirmative.

The familiar principle of constitutional law that "the legislature of this state possesses all legislative authority except as restricted by the State or Federal Constitution, either expressly or by clear implication" has repeatedly been relied on and announced by this court. State ex rel. Agricultural College v. Irvine, 14 Wyo. 318, 389, 84 Pac. 90, 106; State v. Snyder, Treasurer, 29 Wyo. 199, 212 Pac. 771, 779; State ex rel. Voiles v. Johnson County High School, 43 Wyo. 494, 5 Pac. (2d) 255. The controlling force of this principle of law has, so far as we know, never been seriously questioned. It is quite evident there is no language in either the fundamental law of our state or of the nation which either expressly or impliedly operates to deprive the Wyoming Legislature of the right to pass such a resolution as has in this case been drawn in question. There being no restriction of this character, it would seem that the right of the lawmaking body to so act necessarily follows.

The statutory submission of questions to be answered by vote of the people is, as all lawyers know, a practice which has prevailed in the several states of the Union for decades. "In this manner," says Judge Cooley in his

great text on "Constitutional Limitations," Vol. II, Eighth Ed., p. 1354, "constitutions and amendments thereof are adopted or rejected, and matters of local importance in many cases, such as the location of a county seat, the contracting of a local debt, the erection of a public building, the acceptance of a municipal charter, and the like, are passed upon and determined by the people whom they concern, under constitutional or statutory provisions which require or permit it." The same author further remarks:

"It is obviously impossible that any considerable people should in general meeting consider, mature, and adopt their own laws; but when a law has been perfected, and it is deemed desirable to take the expression of public sentiment upon it, or upon any other single question, the ordinary machinery of elections is adequate to the end, and the expression is easily and without confusion obtained by submitting such law or such question for an affirmative or negative vote."

A statute of the State of Illinois authorized an election to be called in a township to ascertain whether a majority of the electors were in favor of subscribing to the stock of a railroad company. Deciding that a court of equity was powerless to restrain the officers from holding or the people from voting at such an election, the court, in Walton v. Develing, 61 Ill. 201, used the following oft quoted language:

"The election proposed would have been an assemblage of the people for a lawful purpose and for consultation for the common good. It would have violated no law; would have been no usurpation of authority, and would have been the exercise of a constitutional right. * * *

"But the attempt to check the free expression of opinion—to obstruct the freedom of elections—if successful, would result in the overthrow of all liberty regulated by law. The mere effort to assume such power is dangerous

to the rights of the citizen. If the courts can dictate to the officers of the people that they shall not hold an election from fear of some imaginary wrong, then people and officers are entirely subservient to the courts, and the consequences are too fearful to contemplate."

In Caldwell v. Barrett, 73 Ga. 604, where the legislature had submitted to the vote of the qualified voters of the county the question whether the sale of liquors in a certain county should be prohibited, holding such submission constitutional, the court said:

"Under our form of government, where the people rule, and where the representatives in the legislature are but the agents of the people, and act alone for them, it would seem that, when the wishes of the people as to whether a proposed act should become a law can be clearly ascertained by an election, this mode would be consonant with the genius and form of our government. The fundamental law of the state, and even particular sections thereof, is, and has been, left, to be determined by a vote of the people. If the constitution, the organic law of the state, has been made to depend upon the vote of the people, it is not easy to perceive why a local law, an act affecting a particular community, should not be determined by a vote of the people of that locality. It has been the practice in this state for more than half a century to leave local questions, such as the location of county sites, the building of public houses, municipal charters and amendments thereof, to the vote of the people to be affected thereby. Such laws have never been thought to be unconstitutional."

So in Locke's Appeal, 74 Pa. St. 491, 13 Am. Rep. 716, where the law authorized the submission to the voters of a particular ward of the city of Philadelphia, Pa., the question of whether licenses permitting the sale of liquor should or should not be granted and forbidding their issuance in the case of a negative vote, the statute was held a proper one as against objections based on constitutional grounds, the court using the following language:

"And why shall not the legislature take the sense of the people? Is it not the right of the legislature to seek information of the condition of a locality, or of the public sentiment there? The Constitution grants the power to legislate, but it does not confer knowledge. The very trust implies that the power should be exercised wisely and judiciously. Are not public sentiment and local circumstances just subjects of inquiry? A judicious exercise of power in one place may not be so in another. Public sentiment or local condition may make the law unwise, inapt, or inoperative in some places, and otherwise elsewhere. Instead of being contrary to, it is consistent with, the genius of our free institutions, to take the public sense in many instances, that the legislators may faithfully represent the people, and promote their welfare. So long, therefore, as the legislature only calls to its aid the means of ascertaining the utility or expediency of a measure, and does not delegate the power to make the law itself, it is acting within the sphere of its just powers."

Coming somewhat closer to the question before us, in Fuller, et al. v. Mayor of Medford, 224 Mass. 176, 112 N. E. 873, 874, it appeared that a statute of Massachusetts constituting a city charter directed that the Board of Aldermen of the City, upon the written request of a specified number of voters, should place upon the municipal election ballot any question of public interest set forth in such request if the question could be shortly answered "yes" or "no." In 1913, under this law, the question of whether money should be appropriated or borrowed for the erection of a city hall was submitted to the voters of the municipality and the majority of them answered the question in the negative. Subsequently and in 1916, the Board of Aldermen ordered the Mayor and City Treasurer to borrow money to construct a city hall. Suit was brought to restrain the officers named from complying with the order. Holding that the suit should be dismissed and that the result of the vote in 1913 was merely advisory, the court said in the course of the opinion filed:

"It may well have been thought that the machinery for the expression of an advisory opinion by the voters of a city at a public meeting was quite inadequate, in view of the inconvenience of gathering at a single hall a substantial proportion of the citizens, and that this should be supplemented by giving to any voter the privilege of expressing his view so that it would be counted. Advisory expressions of public opinion participated in by large numbers of people may have been deemed likely to be a sufficiently strong incentive to action by city officers. It is no idle form to secure a definite conception in this form of what the people think on any subject of general interest. Ample scope thus is given for the operation of the language of the section without stretching it to include that which, when intended, commonly is expressed by clear words."

Inasmuch as the legislature may properly provide that laws relating to the local administration of a portion of the state shall become operative when the popular will is expressed on a question submitted to the electorate and may also properly provide for the expression of the views of the electorate relative to such matters even though they be regarded as advisory only, it would certainly seem logical to conclude that the law-making body may, in similar fashion, legally take an advisory expression of views from all the voters of the state on a question concerning which that body may at any time be called upon to legislate.

A substantially identical question with that now before us has already been considered and determined adversely to the contentions of appellant, in the case of State ex rel. Fulton v. Zimmerman, 191 Wis. 10, 210 N. W. 381, 383. That case was an original action in the Supreme Court of Wisconsin brought to restrain the submission to the voters of that state, in the November 1926 election, of the question whether Congress should amend the Volstead Act (27 U. S. C. A.), so as to authorize the manufacture and sale of 2.75 per cent beer. Both houses of the state legislature

had adopted a resolution directing that such submission be made. This resolution was not, as in the case at bar, either presented to or approved by the executive. The cause was submitted on relator's demurrer to the answer filed. Holding that the relator was not entitled to the relief demanded and that the demurrer should be overruled, the court said in part:

"All doubts as to the power of the legislature to act in this matter or as to the legality of the action taken must be solved in favor of the validity of the action of the legislature. The courts cannot interfere with such legislative action unless it is clear that the action taken is contrary to some mandate of the constitution. Viewing the resolutions in this light, we have no doubt of the power of the legislature to submit this question to a vote of the people of the state.

"The federal government is our government none the less because we have a subordinate independent government of our own within it. The people of Wisconsin have a right to express their will to their representatives in Congress as well as to their representatives in the legislature. The enforcement of the prohibition amendment lies within the field in which the legislature has concurrent power with Congress. The particular legislation outlined in the question submitted must be enacted by Congress because it calls for an amendment of a federal act. But it by no means follows that an expression of the will of the voters upon this particular question will not give the legislature of Wisconsin information which will aid it in the proper discharge of its duties in the exercise of its concurrent power to pass appropriate legislation to enforce the Eighteenth amendment. * * *

"The constitution vests the legislative power in the senate and assembly. The only limitations upon the exercise of that power by the legislature are those found in the state and federal constitutions. Neither constitution prohibits the use of a joint resolution for the purpose of designating questions to be submitted to the people."

It is suggested that there are no provisions in the Federal Constitution or in the Constitution of Wyoming

which contemplate the gathering or expression of public sentiment on the question embodied in the resolution aforesaid or for the purpose of securing legislation relative thereto. We cannot agree that this is so.

Recalling certain facts from English constitutional history which preceded the adoption of the Constitution of the United States, we may not overlook the right of petition. This right, attacked by royal arbitrary power which sought to crush the liberties of the people of England, was vindicated in the trial and acquittal of the seven bishops in the reign of James II, an event regarded as one of the most noteworthy victories of the law, according the English subject that great privilege. Later came the Bill of Rights passed in the first year of the reign of William and Mary, after the revolution of 1688, where the right of the subject to petition is set forth. Referring to this right, Lord Mansfield in the trial of Lord George Gordon in 1780 for high treason, charged the grand jury (21 How. St. Tr. 487) in these words:

*"To petition for the passing or repeal of any act is the undoubted inherent birthright of every British subject;* but under the name and colour of petitioning, to assume command, and to dictate to the legislature, is the annihilation of all order and government. Fatal experience had shewn the mischief of tumultuous petitioning, in the course of that contest, in the reign of Charles the first, which ended in the overthrow of the monarchy, and the destruction of the constitution; and one of the first laws after the restoration of legal government, was a statute passed in the 13th year of Charles 2, Ch. 5, enacting, that no petition to the king, or either house of parliament, for alteration of matters established by law in church or state, (unless the matter thereof be approved by three justices, or the grand jury of the county) shall be signed by more than twenty names, or delivered by more than ten persons.''

Thus it appears that the right of petition for the enactment or repeal of laws was long ago not only regarded as

vital to the existence of an enlightened commonwealth, but as subject to reasonable regulation to prevent abuse. It is also clear in what respects this right which the fathers of our Government desired to be perpetuated and protected was designed to be used in the administration of public affairs.

The first amendment to the Federal Constitution provides that "Congress shall make no law  *  *  *  abridging  *  *  *  the right of the people peaceably to assemble and petition the Government for a redress of grievances." This prohibition is, of course, operative only upon Congress. Concerning its provisions, Mr. Chief Justice Waite, in United States v. Cruickshank, 92 U. S. 542, 552, 23 L. Ed. 588, had this to say:

"The particular Amendment now under consideration assumes the existence of the right of the people to assemble for lawful purposes, and protects it against encroachment by Congress. The right was not created by the Amendment; neither was its continuance guarantied, except as against congressional interference. For their protection in its enjoyment, therefore, the people must look to the States. The power for that purpose was originally placed there, and it has never been surrendered to the United States.

"The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, or for anything else connected with the powers or the duties of the National Government, is an attribute of national citizenship and, as such, under the protection of and guarantied by, the United States. The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances."

The Constitution of Wyoming, in order to fully protect the enjoyment by our citizens of this right, declares in unmistakable terms (Art. 1, Sec. 21):

"The right of petition, and of the people peaceably to assemble to consult for the common good, and to make known their opinions, shall never be denied or abridged."

Judge Cooley, (Constitutional Limitations, Vol. I, Eighth Ed., p. 728), referring to the right preserved by constitutional phraseology of this character, quotes with approval from another authority, to the effect that it is "a sacred right which in difficult times shows itself in its full magnitude, frequently serves as a safety-valve if judiciously treated by the recipients, and may give to the representatives or other bodies the most valuable information. It may right many a wrong, and the deprivation of it would at once be felt by every freeman as a degradation. The right of petitioning is indeed a necessary consequence of the right of free speech and deliberation,—a simple, primitive, and natural right."

In Spayd v. Ringing Rock Lodge No. 665, 270 Pa. 67, 113 Atl. 70, 72, 14 A. L. R. 1443, a by-law of a mutual benefit society provided that a member thereof should be expelled who used his influence to defeat any action taken by its governing body. A member petitioned the Legislature of the State of Pennsylvania to repeal a statute which had received the sanction of the governing authority and was in consequence deprived by the society of his membership. Affirming an order directing his reinstatement, the Supreme Court of that state, among other things, said:

"Our state Constitution, by various sections of Article 1, provides that all men 'have certain inherent and indefeasible rights,' among others, to address by petition those invested with the powers of government, and that this 'shall forever remain inviolate.' §§ 1, 20, 26. * * *

"The Constitution does not confer the right, but guarantees its free exercise, without let or hindrance from those in authority, at all times, under any and all circumstances; and, when this is kept in view, it is apparent that such a prerogative can neither be denied by others nor surrendered by the citizen himself. * * * The right"

here involved and the voting franchise, are the only means by which peaceful changes in our laws and institutions may be sought or brought about, and they cannot, with safety to the state, or the whole body of the people, be gathered into the hands of the few for any purpose whatsoever. Therefore, on principle, the law will not sanction their delegation. We may add that a temporary giving up or denial of an inalienable right, such as the one in hand, is as void as though permanent in character;''

We think it plain, from the language of our national and state charters last above given and the foregoing authorities whose views have been briefly outlined, that neither state nor federal officials — whether executive, legislative or judicial — may assume the power to deny or curtail the right of the people to petition the government, i. e., the proper governing authority involved, relative to matters connected with its powers and its duties.

It is within the judicial knowledge of this Court that our State Legislature has in the past repeatedly, by resolutions duly adopted, memorialized and petitioned Congress concerning dozens of subjects on which that body had power to legislate and in which the citizens of this State have been deeply interested. No one, so far as we are aware, has ever questioned the propriety of so doing. The effect of the resolution now before us is but to present to Congress a memorial, a petition from the people of this State as a whole, expressing their opinion regardless of whether it be for or against the repeal of the Eighteenth Amendment. If the people's representatives may petition Congress as has been so frequently done, in the light of the quoted clauses of the state and national fundamental laws, it is difficult to see why the people themselves may not do so pursuant to the resolution questioned in the instant case.

It may not be amiss here to emphasize a significant sentence in the excerpt from the opinion in Locke's Appeal, supra, which incisively points out that, while our consti-

tutions grant to Congress and to our State law-making body the power to legislate, they do "not confer knowledge." It seems reasonably evident that the result of carrying out the requirements of the resolution we are considering will supply that defect in a material and substantial sense, so far as the opinions of the people of this commonwealth are concerned, relative to the subject involved. Under our scheme of government, it certainly will not do to say that constitutional amendments should not represent the will of the majority of the citizens. Every thoughtful person must be aware that no amendment which does not represent the popular will can command respect and obedience.

The Congress of the United States and our own state legislatures habitually seek knowledge as to the expediency of legislation through special committees with their exhaustive hearings and investigations. The information thus derived may or may not be accurate. It certainly does not indicate the will of all of the citizens of the state or nation concerning the subject on which information is sought as thoroughly and fairly as would necessarily be secured in the manner provided by the resolution aforesaid.

It could hardly be sensibly contended that written petitions requesting Congress either to take steps to repeal the Eighteenth Amendment or to decline to do so might not legally be circulated among and signed by the individual citizens of this State and when so signed forwarded to the National Congress for consideration. The resolution in question calls for the prompt taking and certification to that body of our people's views on both the negative and affirmative side of the question at one and the same time. These views are to be expressed under the secrecy of the ballot box free from compulsion by the crowd or coercion by the individual. No question as to forged or fraudulently acquired signatures can arise as in

the case of a signed petition. The entire contemplated procedure makes for furnishing complete, fair, and accurate knowledge concerning the popular will of our citizens on a subject of vital interest to this State and Nation and concerning which it is essential that the law-making authorities of both sovereignties should be advised as fully as possible. After a thoughtful consideration, we are unable to see that any legal obstacle exists to the procedure called for by the resolution, but perceive many and controlling reasons in support of it.

Our conclusion accordingly is that the judgment of the District Court of Laramie County should be affirmed.

*Affirmed.*

KIMBALL, Ch. J., and BLUME, J., concur.