659 A.2d 341

**Delores E. SCOTT**

v.

**COMPTROLLER OF THE TREASURY.**

**No. 1439 Sept. Term, 1994.**

Court of Special Appeals of Maryland.

June 5, 1995.

216

Delores E. Scott, Baltimore, for appellant.

John K. Barry, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Gerald Langbaum, Asst. Atty. Gen., on the brief), Annapolis, for appellee.

Argued before ALPERT, CATHELL and MURPHY, JJ.

CATHELL, Judge.

Appellant, Dolores E. Scott, appearing before this Court *pro se,* appeals from the judgment of the Circuit Court for Baltimore County, which affirmed the judgment of the Maryland Tax Court. The Tax Court had previously affirmed an assessment that the Comptroller of the Treasury, Income Tax

Division, appellee, imposed upon appellant. The question, as rephrased by appellee and by us, is:

Is Appellant exempt from state income tax? [1]

## FACTS

Appellant failed to file a Maryland state income tax return for the 1991 tax year. Appellee assessed her the sum of $1,509.08 inclusive of tax, interest, and penalty based on the information available to appellee, including the amount of tax withheld as indicated on her W–2 forms. Appellant does not allege any computational error in the calculation of the assessment. Rather, appellant contends that, because of her status as an individual of African origin, coupled with the *Dred Scott* decision, the Thirteenth Amendment to the United States Constitution, and the invalidity of the Fourteenth Amendment to the United States Constitution, she is not a citizen of the United States. [2] She also indicates that African Americans are entitled to reparations from the United States government and the failure of the federal government to make these reparations provides her an additional reason to be exempt from Maryland taxes. [3]

---

1. Appellant phrased the question as: "Does the Circuit Court recognize that taxation without representation is illegal?"

2. Appellant indicates that section 12 of the Thirteenth Amendment denies her citizenship. The Thirteenth Amendment only consists of two sections. The record extract, however, reveals portions of a book or article, entitled *The Great Conspiracy*, written by John A. Logan, which provided excerpts from the Congressional Record of the debates surrounding the then proposed Thirteenth Amendment. Senator Saulsbury suggested a proposed amendment with twenty sections. Section Twelve of that proposed amendment read: "The traffic in Slaves with Africa is hereby forever prohibited on pain of death and the forfeiture of all the rights and property of persons engaged therein; and the descendants of Africans shall not be citizens." That proposed section did not become a part of the Thirteenth Amendment or any other part of the Constitution.

3. While appellant has referred to herself as an African, in the context of this opinion we shall refer to her and others whose ancestors came to America from Africa as African Americans.

## ANALYSIS

Appellant contends that she is not a United States citizen because of the Dred Scott case, *Scott v. Sandford,* 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857), which "has never been reversed," and because her African ancestors did not vote to adopt the Fourteenth Amendment, which she claims improperly confers citizenship upon African Americans. She claims that this entitles her to tax exempt status with respect to both federal and state income taxes.[4]

## THE DRED SCOTT DECISION

Despite the fact that the United States Supreme Court has never expressly overturned the *Dred Scott* case, the decision is no longer law in light of the adoption of the Thirteenth and Fourteenth Amendments to the United States Constitution, ratified in 1865 and 1868, respectively. Moreover, even if the *Dred Scott* decision had not been overturned by Constitutional amendment, her reliance thereon for the proposition that she could not be a Maryland citizen, and is, thus, exempt from Maryland taxes, is not supported by that case. While the Supreme Court in *Scott* did hold that those of African descent were not citizens of the United States, it did not hold that they could not be citizens of the state in which they resided.

In discussing this question, we must not confound the rights of citizenship which a State may confer within its own limits, and the rights of citizenship as a member of the Union. It does not by any means follow, because he has all the rights and privileges of a citizen of a State, that he must be a citizen of the United States. He may have all of the rights and privileges of the citizen of a State, and yet not be entitled to the rights and privileges of a citizen in any other

---

4. Appellant's claims as to her federal taxes were heard by the United States Tax Court. At the federal level, she claimed that she was part Cherokee Indian and that this also entitled her to a tax exempt status. That court held that neither her status as an African American nor her status as an American Indian excused appellant from the payment of taxes.

State. For, previous to the adoption of the Constitution of the United States, every State had the undoubted right to confer on whomsoever it pleased the character of citizen, and to endow him with all its rights.... Nor have the several States surrendered the power of conferring these rights and privileges by adopting the Constitution of the United States.

*Id.* at 405.

Shortly after the *Scott* decision, the Maryland Court of Appeals commented upon the status of those of African decent who were free and had long enjoyed the voting franchise and other limited rights of citizenship even before the Civil War.[5] In *Hughes v. Jackson,* 12 Md. 450, 463–64 (1858), the Court stated:

From the earliest history of the colony, free negroes have been allowed to sue in our courts and to hold property, both real and personal, and at one time, they, having the necessary qualifications, were permitted to exercise the elective franchise.

The Court, in holding that "the presumption of slavery arising from color" does not apply in every case, noted that there were "but two cases in which, in a court of law in this State, a negro suffers a disqualification because of the presumption arising from his color," *id.* at 462–63: when he was "adduced as a witness in a case in which any white person is interested," he was incompetent to testify, and, when the issue involved his freedom, he had the burden of proof. *Id.* at 463. The first of these disqualifications would indicate that a difference in treatment between whites and free descendants of Africans existed at that time and affords some support to counsel's argument in that 1858 case that, "[i]f he be free he is still not a citizen nor is he an alien. He occupies an anomalous position, having more rights than a stranger, yet not the same

---

**5.** Slavery was prohibited in Maryland by a Maryland Constitutional amendment adopted in 1864. This was prior to the ratification of the Thirteenth Amendment to the United States Constitution that prohibited slavery nationwide.

as an heir." *Id.* at 459 (argument of counsel). Even assuming that to be true in 1858, there is still nothing in the *Scott* decision preventing Maryland from awarding citizenship to descendants of Africans.

## THE FOURTEENTH AMENDMENT

The Fourteenth Amendment of the Federal Constitution provides, in pertinent part, that "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." It was proposed by two-thirds of each Congressional house and was ratified by three-fourths of the State Legislatures, thus satisfying the requirements for amending the Constitution as provided for in Article V.[6]

Appellant's expressed concern with the Fourteenth Amendment arises out of her contention that African Americans had essentially no say in the passage of that Amendment and, further, she believes, that the main purpose of the act was to subject descendants of Africans to income tax.[7]

As to her position that the exclusion of African Americans from the debates preceding the ratification of the Fourteenth Amendment results in non-citizen status for them, appellant does not explicitly state what she believes *is* required to pass a constitutional amendment that affects a group of people who have little or no power in the political process at a particular time. Presumably, a referendum of all those to be affected, or some other similar procedural requirement, prior to the commencement of the debates on proposed amendments, might

---

**6.** Article V provides:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States....

**7.** Appellant has also expressed the belief that another reason for its passage was to subject African Americans to military service.

satisfy appellant. We reject, however, any notion that such an extra constitutional procedure is *required* in order to ratify an Amendment. If such a procedure were required, the validity of the Thirteenth (abolishing slavery), Fifteenth (abolishing race as a condition to vote), and Nineteenth (abolishing gender as a condition to vote) Amendments would all be void. Were appellant to be right, slavery itself could be, as far as the Constitution is concerned, reinstated. We do not believe that appellant is herself seeking that result.

 While it would appear to be constitutionally permissible to use a referendum to measure public opinion concerning a proposed Amendment, *see Spriggs v. Clark,* 45 Wyo. 62, 14 P.2d 667, 669 (1932) (holding that a referendum was permissible "to supply the political body whose duty it is to initiate proceedings to change the National Charter with reliable information concerning the attitude of the people"), as we have indicated, it is not required. Indeed, a State imposed *mandatory* referendum would not even be constitutional. *See Hawke v. Smith,* 253 U.S. 221, 227, 40 S.Ct. 495, 497, 64 L.Ed. 871 (1920). Appellant's arguments appear to be borrowed from a document, found in the Extract, entitled "Black Reparations Now! Solutions to the Crisis in Democracy & Black Survival in the USA." The writer states:

Although the 13th Amendment set no restrictions on the freedom of former slaves, the 14th Amendment, passed several years later, robbed Africans of some of their hard won freedom. Citizenship was imposed upon Africans without their consent, without a vote, without any discussion of political alternatives. No payment was made for labor or damages.

During Reconstruction, politicians made the campaign promise of "forty acres and a mule" to every freed African. A bill providing for Forty Acres and a Mule, a form of reparations, passed both houses of Congress only to be vetoed by then President Andrew Johnson.

While the article may be of some interest, it does not—nor does it claim to–assert any other Constitutional adoption procedure in relation to the passage of Amendments. As we have said, Article V sets forth the procedural requirements that must be satisfied in order to ratify an amendment. The Fourteenth Amendment was ratified in accordance with this procedure. Indeed, appellant does not contend that it was not.

Appellant's other concern with the Fourteenth Amendment appears to be her belief that the reason for its ratification was to subject descendants of Africans to income taxation. Appellant states in her notice of appeal:

> Referring back to the 14th Amendment—when America no longer had Africans in bondage for the purpose of providing free labor, an amendment was added to the Constitution illegally including Africans in America as citizens of the United States. Europeans could then impose taxation upon Africans in America because of conditional U.S. citizenship. Africans in America were then forced to pay income taxes even in spite of low wages, and in spite of lack of protection supposedly provided by the 14th Amendment.

We note that there was an income tax in effect at the time the Fourteenth Amendment was ratified. This was for the purpose of generating revenue to pay off the debt the federal government generated during the Civil War. This tax initially survived a constitutional challenge. *See Springer v. United States*, 102 U.S. 586, 26 L.Ed. 253 (1881). The Supreme Court later, however, declared an income tax unconstitutional in *Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759 (1895).[8] The *Pollock* decision itself, however, was later negated by the enactment of the Sixteenth

---

8. This decision held that some of the income taxes that Congress had attempted to impose were unconstitutional as direct taxes that had not been apportioned among the states. The Supreme Court later struck down the entire tax act, holding that the act consisted of one scheme of taxation. *See Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601, 15 S.Ct. 912, 39 L.Ed. 1108 (1895).

Amendment, which was ratified in 1913.[9] The Sixteenth Amendment expressly authorized an income tax. We, thus, find this particular contention to be without merit.

■ Furthermore, we note that, other than her bald assertion that the purpose of the Fourteenth Amendment was to subject African Americans to an income tax, there was no evidence presented that this was the case. In fact, we hold that, contrary to appellant's assertion, one of the primary purposes behind the enactment of the Civil War Amendments (the Thirteenth, Fourteenth and Fifteenth Amendments) was to free slaves, enfranchise them, and benefit and protect the African Americans.

Moreover, even if appellant could produce some evidence, credible or otherwise, to support her contention as to the reasons for the passage of the Fourteenth Amendment, it should be noted that no Constitutional Amendment has ever been declared invalid.[10] Indeed, if properly adopted and ratified, it is difficult to perceive of any likely circumstances in which such a change in the foundation of a constitutional government could be void. The Supreme Court, with respect to an oath case that arose out of Maryland, *Whitehill v. Elkins,* 389 U.S. 54, 57, 88 S.Ct. 184, 185, 19 L.Ed.2d 228 (1967), has stated that, "while the procedure for amending it is restricted, there is no restraint on the kind of amendment that may be offered." [11] The Supreme Court, however, on two

---

**9.** The Sixteenth Amendment did not effect the Supreme Court's holding in *Pollock,* 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759, that the federal government could not tax municipal bonds. In *South Carolina v. Baker,* 485 U.S. 505, 524, 108 S.Ct. 1355, 1367, 99 L.Ed.2d 592, *reh'g denied,* 486 U.S. 1062, 108 S.Ct. 2837, 100 L.Ed.2d 937 (1988), the Court overruled that portion of *Pollock.*

**10.** The Eighteenth Amendment establishing prohibition was repealed by the Twenty–First Amendment, but did survive a Constitutional challenge in the courts.

**11.** The case involved taking an oath that one was not overthrowing the government. The Court discussed whether a Constitutional Amendment changing the form of government would be encompassed within the term "overthrow."

earlier occasions, did at least inquire, albeit briefly, into whether the subject matter of an Amendment was outside the permissible scope of the Constitution. In *State of Rhode Island v. Palmer*, 253 U.S. 350, 386, 40 S.Ct. 486, 488, 64 L.Ed. 946, 947 (1920), with respect to the validity of the Eighteenth Amendment, it was held that prohibition was "within the power to amend reserved by article 5 of the Constitution." In *Leser v. Garnett*, 258 U.S. 130, 136, 42 S.Ct. 217, 217, 66 L.Ed. 505 (1922), it was suggested that the Nineteenth Amendment, which granted women the right to vote, was invalid because "so great an addition to the electorate, if made without the state's consent, destroys its autonomy as a political body." The Court rejected that notion and held that the effect of the Nineteenth Amendment was the same as the Fifteenth. It then rejected the "suggestion that the Fifteenth was ... not in accordance with law, but practically as a war measure which has been validated by acquiescence," by stating that this suggestion "cannot be entertained," noting that it had recognized the validity of the Fifteenth Amendment for over half a century. *Id.*

Indeed, when the Fourteenth Amendment was challenged in a busing case in the United States District Court of Maryland, the court, citing *Leser*, considered the length of the time the Fourteenth Amendment had been in existence:

> The Fourteenth Amendment has been in existence for nearly a century and has been applied by the Supreme Court in hundreds of cases. While age and usage are not absolute barriers to judicial inquiry, the courts have recognized them as persuasive indicia of validity.

*Maryland Petition Committee v. Johnson*, 265 F.Supp. 823, 826 (D.Md.1967), *aff'd* 391 F.2d 933 (4th Cir.1968), *cert. denied*, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968).

We, thus, hold that the Fourteenth Amendment is valid and appellant's status as an African American neither removes her from citizenship of either the United States or of the State of Maryland, nor relieves her of the obligations of that status.

## TAXATION WITHOUT REPRESENTATION

■ Appellant contends that taxation without representation is illegal. In *Thomas v. Gay*, 169 U.S. 264, 274–77, 18 S.Ct. 340, 344–45, 42 L.Ed. 740 (1898), the Supreme Court stated:

Undoubtedly there are general principles, familiar to our systems of state and federal government, that the people who pay taxes imposed by laws are entitled to have a voice in the election of those who pass the laws, and that taxes must be assessed and collected for public purposes, and that the duty or obligation to pay taxes by the individual is founded in his participation in the benefits arising from their expenditure. *But these principles, as practically administered, do not mean that no person, man, woman, or child, resident or nonresident, shall be taxed, unless he was represented by some one. for whom he had actually voted.... [A]n alien may be taxed as well as a citizen. Mayer [Mager] v. Grima,* [49 U.S.] 8 How. [490] 494 [12 L.Ed. 1168 (1850)].... [Emphasis added.]

Moreover, in the case *sub judice,* appellant has failed to claim that she has not, and currently is not, represented. We further note that appellant has not taken any exception to the Fifteenth Amendment. It is the Fifteenth Amendment that guarantees the rights of African Americans to vote. Section 1 of the Fifteenth Amendment provides:

The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

Although the Fifteenth Amendment uses the term "citizen," which, under appellant's rejected argument concerning the Fourteenth Amendment, would exclude her, we note that, because this Amendment was ratified shortly after the end of the Civil War, the terms "race" and "color" clearly were intended to include African Americans in general and, in particular, the phrase "previous condition of servitude" was intended to refer to those who had previously been slaves. The Fifteenth Amendment clearly ensures appellant's right to vote in both federal and Maryland elections. We hold that

appellant has not been subjected to taxation without representation.

■ We further note that the statutory authority under which Maryland imposes its income tax is not, by its terms, limited to only citizens of the State. Maryland Code (1988, 1994 Cum.Supp.) § 10–102 of the Tax–General Article provides:

**Imposition of tax.**

Except as provided in § 10–104 of this subtitle, *a tax is imposed on the Maryland taxable income of each individual* and of each corporation. [Emphasis added.]

The definitions for an individual and Maryland taxable income are provided in sections 10–101(e) and 10–101(f)(1), respectively. " 'Individual' means, unless expressly provided otherwise, a natural person or a fiduciary." " 'Maryland taxable income' means . . . for an individual, Maryland adjusted gross income, less the exemptions and deductions allowed under this title. . . ." Conspicuously absent from these provisions, as well as in any other relevant section in the Tax–General Article, is the term "citizen." The Internal Revenue Code also uses the term "individual" as opposed to "citizen" in describing those subject to tax. 26 U.S.C. § 1. Taxation does not depend upon citizenship.

## REPARATIONS

■ Appellant also indicates that, because the federal government owes her, and all descendants of slaves, reparations, she is exempt from paying taxes. Whatever underlying merit, *if any*, there may be in respect to the reparations issue, appellant has only alleged that the *federal* government should pay reparations.[12] The State of Maryland and the United States, under a federalist form of government, are separate, though interrelated, sovereign entities. That they are separate is perhaps best illustrated in the context of double

---

12. The doctrine of sovereign immunity would appear to prevent appellant from being legally entitled to reparations from the federal government until, and if, the federal government decides to award them.

jeopardy. In *Claybrooks v. State,* 36 Md.App. 295, 306, 374 A.2d 365, *cert. denied,* 281 Md. 735 (1977), we provided the following quote from *Moore v. Illinois,* 55 U.S. (14 How.) 13, 20, 14 L.Ed. 306 (1852): "Every citizen of the United States is also a citizen of a State or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offense or transgression of the laws of both." As appellant has completely failed to allege that the State of Maryland owes her any reparations, her claim that the federal government does provides absolutely no basis for her failure to comply with *Maryland*'s tax laws.[13]

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

**13.** We do not mean to imply that, if she had alleged that the State owed such alleged reparations, those allegations would have been meritorious. Quite aside from the lack of any legal basis, of which we are aware, providing a legal foundation upon which to base such a claim, the State of Maryland enjoys an independently-based sovereign immunity that, so far as we have discerned, has never been waived in respect to claims of reparations for the labor of one's ancestors during a period of slavery of several generations past.