70 Wyo. 225 (1952)
247 P.2d 767
IN THE MATTER OF THE APPLICATION OF NORTHERN UTILITIES COMPANY FOR AN INCREASE IN ITS RATES AND CHARGES FOR NATURAL GAS FURNISHED TO CONSUMERS WITHIN ROCK SPRINGS, WYOMING.
WYOMING PUBLIC SERVICE COMMISSION I. & S. DOCKET 9146. NATURAL GAS CONSUMERS OF ROCK SPRINGS, WYOMING, ET AL. Protestants and Appellants,
vs.
THE NORTHERN UTILITIES COMPANY OF CASPER, WYOMING, Applicant and Respondent.
No. 2534
Supreme Court of Wyoming
September 2, 1952
*228 For the appellants the cause was submitted upon the brief and also oral argument of Joe R. Wilmetti of *229 Rock Springs, Wyoming, and Teno Roncalio of Cheyenne, Wyoming.
For the respondents the cause was submitted upon the brief of Joseph H. Galicich and Edwin V. Magagna both of Rock Springs, Wyoming, and oral argument by Mr. Magagna.

*232 OPINION
RINER, Justice.
The District Court of Laramie County made an order confirming an order of the Public Service Commission of this state increasing rates to be charged by the applicant, Northern Utilities Company, for natural gas furnished by it to consumers in the city of Rock Springs, Wyoming.
From that order sundry persons who assert that they are customers of and are served by the Northern Utilities Company (hereinafter usually designated "The Company") with natural gas, have appealed to this court. The Public Service Commission, which for convenience hereinafter will be usually referred to as "The Commission" while the customers, the opposing parties in this litigation, will be mentioned as the "appellants."
By its application for an increase in rates which was filed with said Commission July 13, 1948, by the president of the Company, it is stated in substance as follows:
That the Northern Utilities Company acquired its Rock Springs distribution and transmission pipeline system from the Fremont Natural Gas Company in 1926 at a cash cost said to be of $144,651.70; that since then it has additionally invested in this system, and by the end of 1948 will have spent in bettering the system the sum of $548,387.10; that the Northern Utilities Company plans to add capital investment for a new purification plant  the present one being unable to handle peak loads  bringing the total plant investment amount as of December 21, 1949, to the sum of $620,000.00; the total 1949 capital expenditure being estimated to be about $70,000.00.
*233 That upon acquiring the Rock Springs Gas system the rates filed by its predecessor were continued  though considered unreasonbly low by the Company officials and supplied the Northern Utilities Company with a gross margin of only 8 1/2 cents per m.c.f. for handling.
The Company considered at first that an increased business volume would result in a profit even at the low rates under which it endeavored to operate and so aggressively sought new business. However, the Company's increased costs have risen more rapidly than its gross revenue increases, with the result that it was compelled to receive lower profits each year. For example the Company's field cost for gas at the present time is 7 1/2 cents per m.c.f. while at the start of its operations this cost was 5 cents per m.c.f. (1000 cubic feet).
Due to rising costs in its field of operations the Company for three years last past has been unable to recover its operating expenses before depreciation charges were made and consequently it has continued those operations at a loss without any return on the investment of capital made, although gas sales have materially enlarged and increased. The Company has been advised also it may expect an additional increase of one cent per m.c.f. at the hands of the producer of the gas. (Note: the Northern Utilities Company does not produce gas; it buys it from the field producer under a written contract with the latter.)
In addition to field costs the Company is obliged to purify the gas purchased before it can be permitted to enter the Rock Springs distributing system; this operation costs 1 1/2 to 2 1/2 cents per m.c.f. making the resultant city gate gas cost, when considered with transmission expenses, about ten cents per m.c.f.
*234 That while the Commission is familiar with related increases in costs due to labor and salary increases and material costs, it is of special interest to note that direct operational costs have risen from a 1928 ultimate cost of about $20,000.00 per year to an amount in excess of $90,000.00 during the year 1948. General administrative expenses have also proportionately risen during the same period.
The Company now feels its peak volume of business has finally been reached and that any additional future revenue will be minor, at least, so its 1948 gross should be regarded as fairly representative with respect to future years, thus causing the Company to operate at a loss unless relief is granted by a rate increase. That the 13 1/2 cents per m.c.f. present sale rate with increased field and distribution costs causes the Company a continued loss and therefore the Commission is asked for such reasonable rate increase as will result in the recovery of its operating expenses with depreciation charges, and, if possible, provide for some small return on the capital investment at Rock Springs.
That the Commission should note that the Company's capital investment of $403,737.40 made between 1927 and December 31, 1948, has been obtained from outside funds and that the above mentioned sum of $70,000.00 to be invested during the year 1949 must also come from corporate sources outside its earnings from the Rock Springs operations.
Endeavoring to fix the new rates applicable to Rock Springs which will properly spread the requested rate increase, the Company has placed the major portion of such requested increase against its low priced 13 1/2 cents per m.c.f. gas sales so that the commercial and industrial gas sales will bear most of the proposed increase with a correspondingly lower increase to domestic *235 consumers as per attached schedule No. 8, which shows the following composite breakdown:
"20.59% of customers, totaling 364 accounts, will be raised an average of 2.89%; 55.47% of customers, totaling 994 accounts, will be raised an average 12.85%; 13.78% of customers, totaling 247 accounts, will be raised an average of 20.11%; 3.91% of customers, totaling 70 accounts, will be raised an average of 25.54% and 6.25% of customers, totaling 112 accounts, will be raised an average of 26.32%."
The attention of the Commission is also directed to the fact:
"that passing merely the 2 1/2c per m.c.f. increased field cost on to the 13 1/2c per m.c.f. gas users would mean an increase of approximately 20%, whereas, the below proposed new rate of 16 1/2c per m.c.f. will only pass 3c per m.c.f. increase to affected customers and the overall requested increase of $29,600.00 is only an increase of approximately 16% on undersigned's annual gross of $182,899.00 at Rock Springs for 1948, also to the fact that such requested increase of $29,600.00 is only about $7,700.00 in excess of the amount which cost of gas involved, has increased to" the Company.
The Northern Utilities Company requests that the Commission grant the Company permission to establish as of October 1st, 1949, the following proposed new rate scale which will increase the Company's earnings about $29,600.00 per year if all present customers continue to use natural gas:

"Minimum charge $3.00 per mo.
"First 6 m.c.f. per mo. Gross 50c per m.c.f.
 Net 45c per m.c.f.
"Next 19 m.c.f. per mo. Gross 27 1/2c per m.c.f.
 Net 25c per m.c.f.
"Next 125 m.c.f. per mo. Gross 21c per m.c.f.
 Net 19c per m.c.f.
"Balance Gross 18c per m.c.f.
 Net 16 1/2c per m.c.f.

*236 If the above requested rate increase is approved the Company hopes that this will enable it to cover its operating expenses, depreciation, income tax and to make not to exceed 3% on its capital investment at Rock Springs.
Information schedules are attached as exhibits to this application and submitted as a part thereof by the Company in aid of its hereby requested rate increase at Rock Springs. The Company offers to amend and supplement its application as required to conform same with affecting Commission rules and regulations upon receipt of notice from the Commission of any "related deficiency herein." This application is signed by J.M. McIntire, the Company's president.
The following pertinent information schedules were attached to and made a part of the foregoing application of the Company. Testimony concerning them was supplied by the president of the Company, J.M. McIntire, who was called as a witness on behalf of both the Company and the appellants:

 "EXHIBIT NO. 1
 "OPERATING STATEMENT
 1948 1947 1946 1945
Gas Sales .............. $182,899.53 $165,516.43 $148,862.41 $133,864.51
Minimum and Discounts .. 3,912.20 2,614.97 2,911.23 2,719.70
 ___________ ___________ ___________ ___________
 186,811.73 168,131.40 151,773.64 136,584.21
Expenses
Natural Gas Purchased .. 55,613.53 44,638.57 35,068.70 32,322.35
Field Expense .......... 5,847.77 5,030.31 4,304.33 2,658.11
Transmission Expense ... 1,952.58 1,942.19 1,563.31 3,285.53
Purification Plant
 Expense .............. 12,734.74 14,581.78 12,195.80 11,063.68
Distribution Expense ... 58,895.73 66,468.00 74,161.66 32,451.14
Customer's Accounting
 and Collecting ....... 14,198.81 12,680.50 11,760.12 8,463.72
Sales Promotion ........ 1,779.95 1,801.69 1,524.78 1,220.53
Donations .............. 126.00 137.00 94.00 85.00
Administrative
 Expenses ............. 22,918.53 22,576.55 18,825.96 14,678.89
Property Tax ........... 2,525.51 1,965.31 1,550.04 1,229.62
Security Deposit
 Interest ............. 982.69 877.93 807.57 720.98
Franchise
 Participation ........ 1,816.29 1,645.58 1,479.88 1,329.05
 __________ __________ __________ __________
 179,392.12 174,345.41 163,336.15 109,508.60
 __________ __________ __________ __________
Gross Operating
 Income ............... 7,419.61 6,214.01 11,562.51 27,075.61
 ========= =========
Less 3% Depreciation
 Plant ................ 16,327.71 14,604.91 14,305.77 13,906.17
Net Before Tax ......... 8,908.10 20,818.92 25,868.28 13,169.44
 ========= ========= =========
Less 38% Income Tax .... ....... ........ ........ 5,004.22
Net Profit ............. 8,908.10 20,818.92 25,868.28 8,165.22
 ======== ========= =========
Cost Plus
 Depreciation ......... $195,719.83 $188,950.32 $177,641.92 $123,414.77"

(Note: Where the figures have been parallel underscored they were typed in the original exhibit in red figures indicating losses.)
*237 In this connection Exhibit No. 4 introduced in evidence but not attached to the Company's application reflects:
"Exhibit 4. Operating Statement of the Northern Utilities Company at Rock Springs for the year 1949, based upon actual operations for period January 1 to September 29, 1949, and estimated three months from October 1 to December 31. (Record 41.)
"This exhibit sets forth that, based on actual operations for nine months and estimated operations for three months, the net loss for 1949 would be $21,557.94."

 "EXHIBIT NO. 2
 "ADMINISTRATIVE AND GENERAL EXPENSE"
 January 1 to December 31, 1948
 Percent
 Chargeable Rock Springs
 Total to Rock Proportionate
 Expense Springs Expense
(1) Salaries of General Officers
 and Executives ............... $ 37,750.95 .18429 $ 6,957.17
(2) Other General Office Salaries .. 29,494.23 .18429 5,435.49
(3) Expense of General Officers
 Traveling Expense .............. 3,438.93 .18429 633.76
 Auto Expense ................... 590.69 .18429 108.86
(4) Expense of General Office Employees
 Traveling Expense .............. 1,569.99 .18429 289.33
 Auto Expense ................... 1,532.09 .18429 282.35
 General Office Supplies and Expense
 Memberships and Subscriptions .. 1,526.29 .18429 281.28
 General Expense ................ 50.09 .18429 9.23
(5) Building Service ............... 5,762.84 .18429 1,062.03
 Communication Service .......... 1,940.16 .18429 357.55
 Office Supplies ................ 797.42 .18429 146.96
 Postage ........................ 452.60 .18429 83.41
 Printing and Stationery ........ 855.83 .18429 157.72
 Administrative and General Expense
(6) Special Services ............... 4,977.21 .18429 917.25
 Special Legal Services ......... 2,118.58 .18429 390.43
(7) Insurance  Fire, Storm, Burglary 1,862.30 .18429 343.20
(8) Injuries and Damages, P.L. & P.D. 8,498.87 .18429 1,566.26
(9) Employees Welfare Expense ....... 15,774.74 .18429 2,907.13
(10) Miscellaneous General Expenses 1,877.96 .18429 346.09
 Maintenance of General Property 
 Structures and Improvements
(11) Office and Warehouse ........... 864.92 .18429 159.40
 Residences ..................... 1,135.29 .18429 209.22
 Maintenance of General Property
 Office Furniture and Equipment . 490.65 .18429 90.42
 Maintenance of Miscellaneous Property
 Laboratory ..................... 50.72 .18429 9.35
 Rents .......................... 947.61 .18429 174.64
 __________ ______ _________
Total Meters, 12-31-48 11,178
Rock Springs, 12-31-48 2,060
Percent charged to
 Rock Springs .18429"

*238 The above account submits an itemized statement of the Company's general expenses and their special allocation to Rock Springs.

 "EXHIBIT NO. 3
 "NOTES FOR ADMINISTRATIVE AND GENERAL EXPENSES
 (Explanatory of preceding exhibit)
(1) Directors and Officers Salaries.
(2) Accounting, Engineering, PBX, Stenographic, Bookkeeping.
(3) Expenses of Directors and Officers.
(4) Expenses of (2).
(5) Building Service, Janitor, Utilities and Operating Expense.
(6) Special Services  Accounting  Mt. States Employees and other
 outside Professional Services.
(7) Insurance  Fire, Storm, Burglary.
(8) Injuries and Damages  Public Liability and Public Damage.
(9) Employees Welfare: Equitable, Inter-State and Workmen's Compensation.
(10) Miscellaneous General Expense  Trustees Expense, Printing of Annual
 Statement.
(11) Maintenance of General Property:
 Structures and Improvements.
 Office and Warehouse  Casper.
 Residences  Field."
 "EXHIBIT NO. 4
 "PRESENT AND PROPOSED GAS RATE SCHEDULES
 Gross Net
Present Rate
 Minimum charge ............................... $3.00
 First 6,000 cubic feet ....................... .50 .45
 Next 19,000 cubic feet ...................... .25 .22 1/2
 Next 975,000 cubic feet ..................... .15 .13 1/2
Proposed Rate
 Minimum charge ............................... $3.00
 First 6,000 cubic feet ....................... .50 .45
 Next 19,000 cubic feet ...................... .27 1/2 .25
 Next 125,000 cubic feet ..................... .21 .19
 Balance cubic feet ................... .18 .16 1/2"
 "EXHIBIT NO. 5
 "SCHEDULE SHOWING COMPARATIVE INCOME FROM OLD AND
 PROPOSED NEW RATES
 Old Rate New Rate
548 M. cubic feet at .50 .................... 274.00 274.00
128,623 M. cubic feet at .45 ................ 57,880.35 57,880.35
263,084 M. cubic feet at .22 1/2 ............ 59,193.90 65,771.00
485,565 M. cubic feet at .13 1/2 ............ 65,551.28
338,395 M. cubic feet at .19 ................ 64,295.05
147,170 M. cubic feet at .16 1/2 ............ 24,283.05
 __________ __________
 182,899.53 212,503.45
Estimated Increase ........................... 29,604.00"
 "EXHIBIT NO. 6
 "PRO FORMA PROFIT AND LOSS AFTER RATE INCREASE
 (Applied For)
 1948 1947 1946 1945
Present Income ...... $186,811.73 $168,131.40 $151,733.64 $136,584.21
Anticipated Rate
Increase ............ 29,604.00 29,604.00 29,604.00 29,604.00
 _________ _________ _________ _________
 216,415.73 197,735.40 181,377.64 166,188.21
Operating Expense ... 179,392.12 174,345.41 163,336.15 109,508.60
 _________ _________ _________ _________
 37,023.61 23,389.99 18,041.49 56,679.61
Depreciation  3% ... 16,327.71 14,604.91 14,305.77 13,906.44
 _________ _________ _________ _________
 20,695.90 8,785.08 3,735.72 42,773.17
Income Tax  38% .... 7,864.44 3,338.33 1,419.57 16,253.80
 _________ _________ _________ _________
 12,831.46 5,446.75 2,316.15 26,519.37"

*239
 "EXHIBIT NO. 7
 "INVESTMENT SCHEDULE
 (This schedule shows both itemized and total investment schedules.)
 1948 1947 1946 1945
Transmission Land
Rights ................. $ 375.00 $ 375.00 $ 375.00 $ 375.00
Mains .................. 233,300.39 233,300.39 233,300.39 232,405.83
Production
Field Meas.
Structures ............. 300.00 300.00 300.00 300.00
Field Meas. Equipment .. 3,010.26 3,010.26 3,010.26 3,010.26
Purification
Plant  Equip. ......... 39,759.44 37,619.43 34,480.89 34,480.89
Purification
Plant  Struct. ........ 3,236.95
Distribution
Land ................... 4,132.36 4,128.98 3,228.98 1,953.98
Structures ............. 4,822.38 3,318.70 3,318.70 3,194.92
Mains .................. 182,140.43 144,653.54 142,630.77 134,374.54
Pumping and
Regulating ............. 8,379.40 5,823.74 5,544.64 4,961.89
Service Lines .......... 31,458.85 26,352.68 22,010.26 19,722.35
Meters ................. 29,650.26 22,007.18 21,681.43 20,958.63
House Regulators ....... 467.03 179.03 99.59 25.83
General Plant
Purification
Plant  Struct. ........ ........ 2,533.88 2,533.88 2,533.88
Office Furniture ....... 2,352.15 2,352.15 2,191.77 1,813.77
Shop Equipment ......... 1,254.50 1,254.50 1,254.50 1,254.70
Tools and Work Equip. .. ......... ......... 377.14 377.14
Communication Equip. ... 3,750.00 3,750.00 3,750.00 3,750.00
 _________ _________ _________ _________
 548,389.40 490,959.46 480,088.20 465,493.41
Less Land .............. 4,132.36 4,128.98 3,228.98 1,953.98
 _________ _________ _________ _________
 544,257.04 486,830.48 476,859.22 463,539.43
3% Depreciation ........ 16,327.71 14,604.91 14,305.77 13,906.17"
 "TOTAL INVESTMENT SCHEDULE
Plant and Property ..... $548,389.10 $490,959.46 $480,088.20 $465,493.41
Working Capital
Cash ................... 15,000.00 15,000.00 15,000.00 15,000.00
Accounts Receivable .... 20,000.00 20,000.00 20,000.00 20,000.00
Inventory Repair
Parts .................. 2,500.00 2,500.00 2,500.00 2,500.00
 _________ _________ _________ _________
Rate Base .............. 585,889.10 528,459.46 517,588.20 502,993.41
Entitled to Earn:
6% on Investment ....... 35,153.35 31,707.57 31,055.29 30,179.60"

To this application there was interposed the following "complaint" signed by Rock Springs Natural Gas consumers and customers of the Company (215 in number, all of whom signed each complaint separately):
 "Rock Springs, Wyoming
 August 9, 1949
"Public Service Commission
State of Wyoming
Cheyenne, Wyoming.
Gentlemen:
Please accept this as a complaint of any contemplated or proposed order of the Commission granting an increase in rates charged for natural gas by the Northern Utilities Company of Rock Springs, Wyoming, of which I am a customer and person served *240 thereby, as requested in an application filed before your honorable commission July 13, 1949.
 Respectfully yours,"
An amendment to the application aforesaid pursuant to the orders of the Commission was filed under date of September 9, 1949, and read substantially as follows:
 "In the Matter of the Application |
of Northern Utilities Company |
for an Increase in its > I. & S. Docket No. 9146
Rates to Natural Gas Consumers |
at Rock Springs, Wyoming |
To: The Public Service Commission of Wyoming
"On August 17, 1949, the Commission ordered that Northern Utilities Company, Casper, Wyoming, file with the Commission on or before September 10, 1949, additional exhibits and statements relative to its Application of July 13, 1949, for an increase in its rates to natural gas consumers at Rock Springs, Wyoming.
"The Commission's Order and Northern Utilities Company's related Exhibits and Statements are as follows:

"ORDER
"For the reasons previously set out, It is Hereby Ordered that the Northern Utilities Company, the applicant herein, itemize in detail for the Years 1946, 1947 and 1948, the sums listed as, `Distribution Expense' under Expenses in Exhibit No. 1 of the initial Application, showing all labor, material or other costs, administrative and otherwise, for what monies were paid and on what installations or main said expenses were incurred, and what service or value was received for the expenses incurred."

See Attached Exhibit No. 1

(Exhibit No. 1 is too prolix to reproduce here.)
"It is Further Ordered that the applicant identify the payee and explain in full the expenditure described as, `Franchise Participation' for the Years 1945, 1946, *241 1947 and 1948 in Exhibit No. 1 of the application herein involved."

The City of Rock Springs (Payee)
"It is Further Ordered that the applicant prepare an Exhibit to supplement Exhibit No. 2 setting forth the actual administrative expense of the Rock Springs office and plant, said expense to be that actually incurred by the Rock Springs office and plant of the applicant and not that chargeable to said plant and office on a percentage basis."
There is no other administrative expense other than that chargeable to said plant and office on a percentage basis.
"It is Further Ordered that the applicant herein file a report to the Commission stating the names of the Company stockholders, officers and directors, the amount of stock held by each and further showing the salaries and returns of office paid to said officers and directors of the company."

See Attached Exhibit No. 2

(Attached Exhibit No. 2 is too prolix to reproduce here)
"It is Further Ordered that the applicant file herein a statement with the Commission indicating the extent and nature of exploration and natural gas production activities carried on by the Northern Utilities Company during the Years 1945, 1946, 1947 and 1948 and showing the costs incurred by such activities."
The Northern Utilities Company did not have any exploration or natural gas production activities or related costs during the Years 1945, 1946, 1947 and 1948.
"It is Further Ordered that the applicant herein file a statement of the dividend policy of the company and an analysis of the surplus account of said company for each year it has operated the Rock Springs property so as to indicate how the earned surplus is reached."
Northern Utilities Company has not paid a cash dividend to the holders of its Common Stock at any time. It has paid a cash dividend to the holders of its Preferred *242 Stock at 7% of $100.00 par value. The amount of each year's dividend is shown in EXHIBIT 3  Analysis of Earned Surplus.
See Attached Exhibit No. 3  Analysis of Earned Surplus (Exhibit No. 3 is likewise too extended for reproduction as it covers the years 1935 to 1948 inclusive. However we do reproduce the Analysis of Earned Surplus for the years 1946-1948 inclusive as follows:

 "1946
Earned Surplus at Beginning of Year ........... ($1,054,907.50)
Add  Adjustment, Misc. Accounts  Prior Year . 827.74
 Adjustment  Income Tax ................... 3,206.56 4,034.30
 ________ _______________
 ($1,050,873.20)
Deduct  Documentary Stamps ................... 46.20
 Increase in Common Stock ............. 42,000.00
 Dividend on Preferred Stock .......... 38,829.00
 Miscl.  1945  Adjustment ........... 5.00 80,880.20
 _________ _______________
 (1,131,753.40)
Net Income for Year Ended Dec. 31, 1946 ....... 217,205.07
Earned Surplus, Dec. 31, 1946 ................. ( 914,548.33)
 _______________
 "1947
"Earned Surplus at Beginning of Year .......... ($ 914,548.33
Add  Income Tax Refund ....................... 14,189.23
 Adjustment of Misc. Accounts  Prior
 Years ................................... 29.80 14,219.03
 _________ _______________
 ( 900,329.30)
Deduct  Depreciation Prior Years ............. 13,333.34
 Bond Discount and Expense  Prior
 Years ................................ 4,342.32
 Gas Purchased  Prior Years .......... 1,328.21
 Dividend on Preferred Stock .......... 38,829.00 57,832.87
 _________ _______________
 ( 958,162.17)
Net Income for Year Ended Dec. 31, 1947 ....... 128,383.12
 _______________
Earned Surplus, Dec. 31, 1947 ................. ( 829,779.05)
 "1948
"Earned Surplus at Beginning of Year .......... 829,779.05)
Add  Income  Prior Year ......... 284.95
 Adjustment  Maintenance  Casper and
 Riverton Prior Years .................. 3,182.01
 Adjustment  Repairs at Casper Laboratory 1,695.73 5,162.69
 _________ _______________
 ( 824,616.36)
Deduct  Income Tax  Prior Years ............. 1,564.94
 Adjust. of Misc. Accounts  Prior
 Years ................................ 175.92
 Dividend on Preferred Stock .......... 38,829.00 40,569.86
 _________ _______________
 ( 865,186.22)
Net Income for Year Ended Dec. 31, 1948 ....... 237,230.91
 _______________
Earned Surplus, Dec. 31, 1948 ................. ( 627,955.31)"

"It is Further Ordered that the applicant herein explain in detail the loss of $6,105,807.65 stated in the Annual Report filed by said company with this Commission for the Year 1934, said year being the first year of operation by the applicant of the properties herein involved."
*243 The loss of $6,105,807.65 stated in the Annual Report for the Year 1934 was the surplus of the predecessor company. During the year it liquidated two companies and wrote down Engineer's value of property accounts. Its surplus was as follows:

Loss on Liquidation ______________________________ $4,286,986.51
Earned Surplus Deficit ___________________________ 1,818,821.14
 _____________
 $6,105,807.65

Dated September 9, 1949, and,
 Respectfully submitted,
 NORTHERN UTILITIES COMPANY
 (Signed) By Conrad H. Cavin
 Vice-President."
On this application as thus supplemented a hearing was ordered by the Commission in the Commission Hearing Room commencing November 18, 1949. This hearing was had and while two witnesses only were examined at considerable length by both counsel for the Company and counsel for appellants, these witnesses being J.M. McIntire, President of the Company and A.M. Haffey, General Manager of the Operations of the Company at Rock Springs, in the brief of counsel for the appellants it is explicitly stated that Mr. McIntire "testified at great length with respect to each item set forth in the Company's application; and, in general collaborated (corroborated) each of the allegations of the petition by stating that said allegations were true;" counsel for protestants or appellants also state that Mr. McIntire testified that the original cost of the Rock Springs property was $503,000.00 "less accrued depreciation through December 31, 1949." Appellants submitted the testimony of no other witnesses.
A brief outline and description of the Northern Utilities Company's history, development and present operations *244 was supplied by Mr. McIntire at the inception of his testimony as follows:
"Q. When was the Northern Utilities Company organized? That is, the present Northern Utilities Company?
"A. 1935.
"Q. And in what state?
"A. Wyoming.
"Q. Is it a successor to another company?
"A. Yes, sir.
"Q. And of what company is it a successor?
"A. Northern Utilities of Delaware.
"Q. What was the occasion for the organization and incorporation of the Northern Utilities Company of Wyoming?
"A. The Northern Utilities of Delaware went into bankruptcy 77-B proceedings of the Federal Court of Wyoming, and came out of bankruptcy as a reorganized corporation called the Northern Utilities Company of Wyoming, a Corporation.
"Q. In what year was that?
"A. 1935.
"Q. What is the Northern Utilities Company of Wyoming? In what business is it engaged?
"A. The Northern Utilities Company of Wyoming is a public utility operating company with its main office at Casper, Wyoming. It operates a utility distribution system in Casper, Wyoming, Glenrock, Lander, Riverton, Hudson, Ft. Washakie, and at Rock Springs. The company does not produce any natural gas. It purchases all the gas from other producers throughout its entire property. It takes in most cases the gas at the well, handles the field operation and all operations incidental to the preparing of the gas for delivery into the transmission system; transports the gas from *245 the field to the various points of distribution, and distributes the gas to the ultimate consumer.
"Q. With reference to the distribution system at Rock Springs, Wyoming, would you just in rough outline explain what that consists of?
"A. The Rock Springs plant is a separate pipe line unit. It receives its gas from the fields of the Mountain Fuel Supply Company, transports the gas from the field to the City Gate Station at Rock Springs. It purifies it, distributes it to the consumers at Rock Springs.
"Q. Is that system connected  and I am speaking physically now  with any other part of the Northern Utilities operation?
"A. No, sir, the pipe line system serving Rock Springs is not connected to the pipe line system serving the other communities of the Northern Utilities Company.
"Q. Where is the nearest other property of the Northern Utilities Company or nearest other utility system?
"A. Lander, Wyoming.
"Q. Approximately how far is Lander, Wyoming, from Rock Springs?
"A. Approximately 100 miles."
After the evidence in the case was concluded before the Commission the cause was argued by counsel for the respective parties. Thereafter on June 12, 1950, the Commission entered its final order disposing of the matter, said order reading as follows:

"ORDER
"IT IS THEREFORE ORDERED by the Commission that said application be and the same is hereby granted, in part; and that Northern Utilities be and it hereby is authorized to place in effect rates which will produce, based on 1948 Rock Springs gas sales, an amount not to exceed $16,500.00.
*246 "IT IS FURTHER ORDERED that applicant shall file with the Commission for approval a rate schedule which apportions said amount ($16,500.00) among its consumers according to the proposed average percent increase applicable to its customer groups as set forth in Exhibit No. 8 attached to the application filed herein, which said exhibit was offered and received in evidence as applicant's Exhibit No. 1H; and that said schedule shall become effective as of the date same is approved by the Commission.
"IT IS FURTHER ORDERED, that applicant shall cancel and withdraw its said rate schedule attached to its application and designated as Wyo. P.S.C. Tariff No. 8, Sheet No. 2, cancelling Sheet No. 1; and that it shall issue a supplement announcing the withdrawal and cancellation thereof; and
"IT IS FINALLY ORDERED, that applicant shall hereafter file with the Commission a separate Annual Report of its Rock Springs operations."
MADE and ENTERED at Cheyenne, Wyoming, this 12th day of June, 1950.

PUBLIC SERVICE COMMISSION OF WYOMING"
The foregoing order was made after reviewing in an extended opinion the evidence in the case and as will be seen it approved in part the Company's application and rejected it in part; after also reviewing appellant's contentions and approving some of them and disproving others. It is from this order complainants appealed to the district court of Laramie County aforesaid. They filed a petition on appeal in the district court which asserted that the order of the Commission was not in conformity to law and "contrary to the findings" in the following respects: viz.:
"(1) The Commission failed in its order to reflect any consideration of the fact that the natural gas sold at Rock Springs is of sub-standard quality, one-fourth to one-third per cent lower in British Thermal Heating Units than the 1000 BTU standard set by law, and that *247 said omission was contrary to Wyoming Compiled Statutes 39-902.
"(2) The Commission did not strike from allowable expenses of the Company the item of expense entitled Services on Customer's premises, free, which item the consumers maintain should be borne by the merchandising and jobbing operations of the utility company, and not by the consumers or rate payers.
"(3) No mention is made in the Opinion, Findings and Order of the Commission of the formula employed to justify the granting of a rate increase; that no consideration was given original costs, historical costs, and other cost and value figures submitted by the company, except to reject them for their lack of authenticity and for their excessiveness, and that the effect of the Order was thus to honor rejected evidence.
"(4) The Commission not only failed to apply its own given formula but applied no other legally recognizable formula, or failed to give findings upon which an appellant Court can pass upon the adaquacy (adequacy) of the basis supporting Commission's Order.
"(5) Consumers maintain that the Commission's Opinion, Findings, and Order lacked findings of fact which are required by law and by the rulings of Courts, and set forth specific acts which it feels the Commission should have done; consumers allege 17 specific grounds upon which it relied for a reversal of the Order of the Commission.
"(6) Consumers maintained that the question of what is a `just and reasonable rate for a gas utility' is one involving several complicated formulae for the determination of a rate base, none of which has ever been discussed or evaluated, or passed upon by the Supreme Court of Wyoming, and because said rates do constitute a constitutional question, ask that the following question be certified to the Supreme Court:
"`What is the law for the determination of "just and reasonable" rates to be charged consumers by franchised, natural gas utility companies?'"
*248 It was asserted by counsel for appellants in their Petition on appeal to the district court that in their opinion the Northern Utilities Company should be allowed no rate increase until such time as it should be able to produce evidence which will "clearly" show justification for an increase in rates.
In this connection it may be observed that this court will, as a matter of general practice, review only those issues and questions submitted to the trial court; if they were not submitted and passed on by that tribunal it follows that we have no occasion to examine the matter further.
To this petition on appeal in the district court the Northern Utilities Company filed, as required by law, an answer stating that there is no error in the record as urged by the objections and assignments of error submitted by the appellants; denying that the Commission acted without or beyond its powers in granting the rate increase and denying also that an important and difficult constitutional question was presented by this litigation.
The Public Service Commission of Wyoming derives its powers to regulate public utilities and to fix the rates for the services they render the public from the Statutes of this state. That being so the following sections of the Wyoming Compiled Statutes (1945) should be regarded as before us for special consideration:
Section 64-111 declares:
"Powers of Commission  The commission shall have general and exclusive power to regulate and supervise every public utility within the state in accordance with the provisions of this Act (§§ 64-101-64-414). (Laws 1915, ch. 146, § 11; C.S. 1920, § 5463; R.S. 1931, § 94-111.)"
Section 64-117 states:
*249 "Who may make complaint  Complaints as to gas, electrical, water or telephone utilities.  Any public utility or any persons served or claiming the right to be served thereby, or any municipality, or any corporation, chamber of commerce or any body politic, or the attorney general may complain to the commission of anything, actual or proposed, done or omitted to be done in violation of this Act (§§ 64-101-64-414) or of an order of the commission.
"Except upon its own motion, the commission will entertain no complaint as to the charges, service or service regulation of any gas, electrical, water or telephone utility, unless the same is signed by a majority of the council, commission or other legislative body of the city or county, or city or town, if any, within which the alleged violation occurred, or by five per cent (5%) of the consumers of such gas, electricity, water or telephone service. It shall be the duty of the commission when these conditions are complied with to entertain such complaint and to proceed therewith. (Laws 1915, ch. 146, § 17, 1917, ch. 74, § 5; C.S. 1920, § 5469; R.S. 1931, § 94-117.)"
Section 64-118 reads:
"Matters to be considered and determined  In conducting any investigation pursuant to the provisions of this Act (§§ 64-101  64-414), the commission may investigate, consider and determine such matters as the cost or value, or both, of the property and business of any public utility, used and useful for the convenience of the public, and all matters affecting or influencing such cost or value, the operating statistics for any public utility, both as to revenues and expenses and as to the physical features of operation in such detail as the commission may deem advisable; the earnings, investment and expenditures of any such corporation as a whole within this state, and as to rates in local exchanges or plants of any telephone, telegraph, water, electrical or gas corporations, the geographical location thereof shall be considered as well as the population of the municipality in which such plant or exchange is located. (Laws 1915, ch. 146, § 18; C.S. 1920, § 5470, R.S. 1931, § 94-118.)"
*250 Section 64-120 reads:
"Rate changed by commission  If upon hearing and investigation any rate shall be found by the commission to be inadequate or unremunerative, or to be unjust, or unreasonable, or unjustly discriminatory, or unduly preferential or otherwise in any respect in violation of any provision of this Act (§§ 64-101  64-414), the commission may fix and order substituted therefor such rates as it shall determine to be just and reasonable and in compliance with the provisions of this act. Such rate so ascertained, determined and fixed by the commission shall be charged, enforced, collected and observed by the public utility for the period of time fixed by the commission. (Laws 1915, ch. 146, § 20; C.S. 1920, § 5472; R.S. 1931, § 94-120.)"
Section 64-121 reads:
"Matters considered in fixing rates  Order changing services or facilities.  In determining what are just and reasonable rates the commission may take into consideration depreciation of plant, obsolescence of equipment, expense of operation, physical and other values of the plant, system, business and properties of the public utility whose rates are under consideration.
"If, upon hearing and investigation, any service or service regulation of any public utility shall be found by the commission to be unjustly discriminatory or unduly preferential, or any service or facility shall be found to be inadequate or unsafe, or any service, regulation shall be found to be unjust or unreasonable, or any service, facility or service regulation shall be found otherwise in any respect to be in violation of any provisions of this Act (§§ 64-101  64-414), the commission may prescribe and order substituted therefor such service, facility or service regulation, as it shall determine to be adequate and safe, or just and reasonable, as the case may be and otherwise in compliance with the provisions of this act. It shall be the duty of the public utility to comply with and conform to such determination and order of the commission. (Laws 1915, ch. 146, § 21, 1917, ch. 74, § 7; C.S. 1920, § 5473; R.S. 1931, § 94-121.)" (Italics supplied.)
*251 Section 64-201 requires rates fixed by the Public Service Commission should be "just and reasonable" and uniform and consequently says:
"Rates just, reasonable and uniform.  All rates shall be just and reasonable, and all unjust and unreasonable rates are prohibited. No public utility shall directly or indirectly by any device whatsoever, or in any wise, charge, demand, collect or receive from any person a greater or less or different compensation for any service rendered or to be rendered by such public utility than is charged, demanded, collected or received by such public utility from any other person for a like and contemporaneous service under similar circumstances and conditions. (Laws 1915, ch. 146, § 27; C.S. 1920, § 5479; R.S. 1931, § 94-127.)"
Appeals from the order of the Commission are governed by section 64-318 as follows:
"Appeal from order  Petition-Copies-Summons-Evidence-Extent of Review-Affirmance-Judgment.  Any party in interest or any person or party authorized under Section 94-117 Wyoming Revised Statutes, 1931 (§ 64-117), to file an original complaint before the Commission, being affected or claiming to be affected by any order, being dissatisfied with any order of the Commission shall have the right to appeal as hereinafter provided. The applicant may, within ninety (90) days after the rendition of the order of the commission, file a petition of appeal with the clerk of the district court of Laramie County. Such petition shall state completely the grounds upon which the review is sought and shall assign all errors relied upon, and shall be accompanied by a copy of the record, including a transcript of the testimony and proceedings, certified by said commission.
"The appellant shall furnish a copy of the petition to each person who is a party to the hearing before said commission. Summons shall be issued upon the petition, directing the adverse party or parties to file answer within thirty (30) days after the service thereof. No new or additional evidence may be introduced in the district court except as to fraud or misconduct of some person engaged in the administration of the law *252 affecting the order, but the court shall otherwise hear the case upon the certified record, including the transcript of the testimony and proceedings, and shall dispose of the case in a summary manner, its review being limited to determining whether or not: (1) the commission acted without or in excess of its powers; (2) the order was procured by fraud; (3) the order is in conformity with law; (4) the finding of facts in issue was supported by any substantial evidence.
"The commission and each party or other person authorized by this Act (§§ 64-101  64-414) to appeal shall have the right to appear in such review proceedings. The court shall enter judgment confirming, modifying or setting aside the order, or in its discretion, remanding the case to the commission for proceedings in conformity with the direction of the court. The provisions of the code of civil procedure shall apply to the proceedings upon such appeal to the district court so far as applicable and not in conflict with the foregoing provisions. (Laws, 1915, ch. 146, § 59; C.S. 1920 § 5511; R.S. 1931, § 94-159; Laws 1933, ch. 119, § 1.)" (Italics supplied.)
Final appeals are authorized by Sections 64-320 and 64-321 as follows:
"§ 64-320. Appeal  Either party to said action may appeal to the court of last resort in the manner prescribed by law for appeals from the decisions of the particular court in which said action or suit was brought. (Laws 1915, ch. 146, § 61; C.S. 1920, § 5513, R.S. 1931, § 94-161.)"
"Section 64-321  Code of civil procedure to apply  The provisions of the code of civil procedure of this state shall so far as applicable and not in conflict with the provisions of this Act (§§ 64-101  64-414), apply to all appellate proceedings held or had under the provisions hereof. (Laws 1915, ch. 164 (146) § 62; C.S. 1920, § 5514; R.S. 1931, § 94-162.)"
Our attention is also directed to the fact that Section 39-902 W.C.S. 1945 says that:
*253 "Standard to be considered in fixing rates  The standard of heating units herein prescribed and any variations therefrom, in any gas distributed by any utility, or utilities, to users of natural gas, shall be taken into consideration by the Public Service Commission as an additional factor to the factors provided for in Section 94-117, Wyoming Revised Statutes, 1931 (§ 64-117), as a basis for fixing rates and rate schedules for the allowable charges the Utility may make against the users of natural gas in any particular town, city or community, in which the question of such rates shall be presented to said Commission, as provided for in Section 94-117, Wyoming Revised Statutes, 1931 (§ 64-117)). (Laws 1933, ch. 123, § 2.)"
In connection with this section it should be noted that the factor discussed therein is to be given consideration with others by the Public Service Commission in prescribing natural gas rates. Section 39-903 provides for a test by a State chemist upon complaint made to the Commission. No complaints seem to have been made on that point but we shall consider that the gas sold in Rock Springs by the Northern Utilities Company contains about 750 or 760 BTU pursuant to what is shown in the record.
According to Section 64-318 supra the district court in reviewing the action of the Commission herein was precluded from hearing new or additional evidence  unless "fraud or misconduct of some person engaged in the administration of the law affecting the order" appealed from exists. Ordinarily the court must hear the cause only "upon the certified record from the Public Service Commission including the transcript of the testimony and proceedings." The court is required to "dispose of the same in a summary manner" its review being limited to determining whether or not:
(1) The Commission acted without or in excess of its powers;
(2) The order was procured by fraud;
*254 (3) The order is in conformity with law;
(4) The finding of facts in issue was supported by any substantial evidence. (Italics supplied.)
So far as concerns the first of these limitations it would appear that the appellants did not contend that the Commission "acted without or in excess of its powers." Their complaint seems to be that the Commission has acted erroneously on the evidence presented to it. The Commission undertook to fix gas rates which would be applicable to the operations of the Northern Utilities Company in Rock Springs  which under the Statutes of this state it was authorized to do  so that the rates fixed should be "just and reasonable" (see Section 64-120 supra).
We consider that under the statutory authority given the courts in matters of this character we need only examine the district court's order confirming the order of the Commission herein to ascertain whether it was in conformity with law and whether the result reached by the Commission was supported by any substantial evidence. On these points it is plain that the burden rested upon the appellants to show that the order of the district court and that of the Commission were erroneous and did not reach a just and reasonable result. As pointed out above the only witnesses called before the Commission were the chief officers of the Company, viz: its president and general manager representing the Company at Rock Springs. As heretofore mentioned it cannot be overlooked that it is conceded by appellants in their brief that the president of the Company stated that the allegations of the application of the Northern Utilities Company for a change in rates aforesaid were true. It may be that this witness was mistaken or in error in some item of his testimony but it was, however, for the Commission to determine these matters for itself and consequently also whether *255 there was any substantial evidence submitted which authorized a rate increase as sought. The Commission evidently concluded that it had sufficient evidence before it to authorize at least a partial increase in the gas rates to be charged by the Northern Utilities Company, in Rock Springs. The outstanding fact prevails, however, that if Mr. McIntire's testimony for the company was true, during the years 1946, 1947, 1948 and 1949 preceding the hearing before the Commission as above described, the Company consistently lost money by its operation of the Rock Springs natural gas plant.
It must be remembered that neither the district court nor this court is authorized to try the case anew and as said by 73 C.J.S. § 64, subdivision (j) (2) (p. 1161):
"The reviewing court will not substitute its discretion for that of the commission, and it will not review or reverse the exercise of discretionary power by the commission except where there has been an abuse of discretion or there is a showing of capricious, unreasonable, or arbitrary action or disregard of law. It has been held that the court will not review administrative discretion of the commission further than to ascertain whether there is sufficient evidence to support the commission's action, and that it may not disturb such discretion unless it clearly appears that the commission's action was both unreasonable and contrary to law."
The case of Federal Power Commission vs. Hope Natural Gas Co. 320 U.S. 591, 64 S.Ct. 281; 88 L.Ed. 333, is urged by appellant upon our attention as deserving especial consideration. In that case Mr. Justice Douglas writing for the majority of the court said:
"And when the Commission's order is challenged in the courts, the question is whether that order `viewed in its entirety' meets the requirements of the Act. Id., 315 U.S. at page 586, 62 S.Ct. at page 743, 86 L.Ed. 1037. Under the statutory standard of `just and reasonable' it is the result reached not the method employed *256 which is controlling. Cf. Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 304, 305, 314, 53 S.Ct. 637, 643, 644, 647, 77 L.Ed. 1180; West Ohio Gas Co. v. Public Utilities Commission (No. 1) 294 U.S. 63, 70, 55 S.Ct. 316, 320, 79 L.Ed. 761; West v. Chesapeake & Potomac Tel. Co. 295 U.S. 662, 692, 693, 55 S.Ct. 894, 906, 907, 79 L.Ed. 1640 (dissenting opinion). It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." (Italics supplied.) (Citing authorities.)
In the later case of Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581; 65 S.Ct. 829; 89 L.Ed. 1206; the court reiterated the statement in the Hope Natural Gas Co. case supra as follows:
"* * * it is `the result reached not the method employed which is controlling. * * * It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.' 320 U.S. page 602, 64 S.Ct. page 287."
The court also said:
"Rate-making is essentially a legislative function. Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77. Congress to be sure has provided for judicial review of the Commission's orders. § 19, 15 U.S.C.A. §§ 717r. But that review is limited to keeping the Commission within the bounds which Congress has created. When Congress, as here, fails to provide a formula for the Commission to follow courts are not warranted in rejecting the one which the Commission employs unless it plainly contravenes the statutory scheme of regulation. *257 * * * Under this Act the appropriateness of the formula employed by the Commission in a given case raises questions of fact not of law."
Our examination of the testimony in the voluminous record submitted by appellants has also been guided by what was said by this court and theretofore repeated many times, in Grantham vs. Union Pacific Coal Co., Wyo. 239 P. (2d) 220 that:
"* * * the rule of appellate procedure when that testimony is conflicting and the other rule likewise so often mentioned and followed by this court when a party comes here with a finding and judgment against him that we: `* * * must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it,' Jacoby v. Town of the City of Gillette, 62 Wyo. 487, 494, 174 P. (2d) 505, 506, 177 P. (2d) 204, 169 A.L.R. 502, and cases cited."
Recurring to the attacks made upon the Commission's order in the district court by appellants as shown in their abstract of the record it would seem that they were mostly concerned in finding fault with the Northern Utilities Company's system of accounting and seem to complain in that connection that the Commission failed to observe these faults in disposing of the litigation. It must not be overlooked that the Commission did not allow the full rate increase asked for by the Northern Utilities Company, but on the contrary decided that the increase should be only a little over half the amount asked for by the Company. The total amount of the increase of income sought by the Northern Utilities Company was, it will be remembered, $29,604.00; while the amount allowed by the Commission as an increase over what it was previously receiving was $16,500.00. The Commission states in its opinion preceding the order it made in this matter that as *258 to the amount asked for by the Company it may be "logically" presumed that "this amount will be sufficient to permit it to recover its operating expenses; recoup its annual depreciation requirement; pay federal income; and allow it to earn an acceptable return." The sum, which in fact was allowed by the Commission should be perhaps regarded as also accomplishing that result, inasmuch as the Company has not appealed from the Commission's order and any such question is in consequence not before us.
Under the statutes of this state above quoted and reviewed it is apparent that the Northern Utilities Company is entitled to have a rate increase that is "just and reasonable" and which will be productive of a proper return on the investment. The Supreme Court of the United States in the Hope case supra has asserted that such a return "should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital."
The appellants complain of the low BTU content of the gas which the Company sells to Rock Springs consumers and that fact should have been considered by the court and employed by it as justifying instead of an increase in rate for such customers, a reduction and section 39-902 supra is cited as authority for that position. Upon examination of that section it is seen that § 64-117 to which it refers and undertakes thereby to inject another factor with those the Commission may consider in fixing rates, merely deals with the matter of who may make a complaint to the Commission and has nothing whatever to do with the factors which the Commission "may" consider in fixing rates  (section 64-118, 64-121 supra). It is evident that § 39-902 was carelessly drawn and enacted. But assuming that sections 64-118 and 64.121 supra were intended, in view of the Commission's action materially reducing the *259 amount that the Company should be allowed by way of increase, how can it be assumed that the court and Commission did not give the factor, namely the Rock Springs gas being of non-standard quality, consideration? We cannot tell nor is there anything in the record that the Commission did not consider this element in addition to those suggested in sections 64-118 and 64-121.
Additionally it may be observed that gas consumers in Rock Springs have been using this sub-standard gas for more than 20 years without complaint so far as it appears here. The field from which it is drawn is approximately 20 miles from Rock Springs. The appellants have not shown by proper evidence before the Commission that there are other fields closer to the Rock Springs consumers which could supply standard BTU gas; there is no proof that if that were so, the Northern Utilities Company is financially able to procure it. However, the logic of appellants necessarily would lead to the conclusion that if a new field, assuming that one could be found which would be convenient and which would supply a superior type of gas, then the commission should raise rates to the consumers even beyond what was authorized.
The appellants contend also that the item "service on customers' premises" should not be included as expenses against the Company's customers in Rock Springs. The testimony of the Company's general manager at Rock Springs, Mr. Haffey, shows without dispute that these services were for the purpose of checking the gas used in the Company's distribution system in Rock Springs, were rendered to all customers who might call for it, and embraced the checking of leaks, turning gas on and off and was a safety factor for both the customer and the Company. It is also apparent that where service lines were repaired or appliances of gas users were repaired the charge was made to the *260 customer and not to the operations account of the company. The Commission itself answered and negatived this contention in its opinion preceding its rate order supra, as follows:
"Protestants allege and seriously contend that this expense should not be charged to Rock Springs rate-payers but same should be borne in its entirety by Northern's appliance department. This service is performed by Northern in the interests of public health and safety. It is common practice among gas utilities in this state to render this type of service to their customers, regardless of whether the appliances involved were purchased from the utility servicing the same, or otherwise. The consumer expects such service and we think he should be obliged to pay his proportionate share of the cost thereof. We conclude that the major portion of this cost is properly chargeable to Northern's utility operations. By applicant's Exhibit No. 9, Northern has voluntarily charged 16 per cent of the labor cost of this free service to its appliance department, and we approve this apportionment."
We are inclined to think that the view expressed by the Commission on this point and thus stated was correct.
Relative to contention No. 3 made by appellants as quoted supra our attention is not directed to any Wyoming statute making such employed "formula" to be stated by the Commission and we fail to perceive that because the Commission did not feel that it could properly give weight to certain data submitted by the Company that the effect of the order was "to honor rejected evidence." We think that the appellant's conclusion on this point is on non-sequitur.
Concerning contentions numbers 4 and 5 objecting that the Commission made no findings as desired by appellants it may be observed that the statutes quoted above nowhere prescribe stated findings as insisted by *261 appellants shall be prepared by the Commission. But if there was error in denying this contention of appellants in our view of the entire case it was not of sufficient prejudicial character to call for a reversal of the order under review.
Relative to appellant's contention No. 6 it is rather apparent that counsel for appellants were unfamiliar with the proper method of raising constitutional questions in the trial courts of the state. See State ex rel Voiles vs. Johnson Co. High School 43 Wyo. 494, 5 P. (2d) 255; Tax Payers League vs. McPherson 49 Wyo. 251, 54 P. (2d) 897.
A careful examination of the evidence submitted in this case, which we should under the authorities cited properly consider, supports the view that during the years 1946, 1947 and 1948, the Northern Utilities Company's operations in Rock Springs were far from profitable. We note that appellants did not undertake to establish before the Commission that this was not so. The burden of proving that they were in fact profitable according to the Hope case supra, rested upon them. It would appear that the Northern Utilities Company so far as concerns its Rock Springs plant and operations like its predecessors who also handled this Rock Springs plant previous to the purchase from them by its present owner was headed for the bankruptcy court. A concern which is yearly in an integral and important part of the system operated at a loss can hardly be said to be in a position to promote confidence in the financial integrity of the enterprise so as to maintain its credit and to "attract capital" (Hope case supra). The order of the Public Service Commission of Wyoming and that of the district court was in fact in aid of the Rock Springs customers of the Company in an effort to enable the Company to continue its functions at a profit. It is common knowledge *262 since 1946, at least, costs of material, labor and many other items have steadily risen. It is only just and reasonable that this increase should be borne to some extent by the person for whose benefit the gas is supplied. They can hardly expect the Company to continue its operations at Rock Springs on a steadily increasing loss basis. The Company is not shown to have been improvident or imprudent in the handling of its affairs. Mistakes it may have made, but all corporate enterprises are prone occasionally to do that.
We do not think the order of the district court of Laramie County upholding the action of the Public Service Commission in the premises was wrong and consequently our conclusion is that it should be affirmed and an order to that effect should be entered.
Affirmed.
BLUME, C.J., and ILSLEY, J., concur.